# CHOICE *vs.* THE STATE OF GEORGIA.

1. C. is indicted for murder. The plea of insanity is interposed: *Held,* That it is not competent to prove, by a subsequent conversation with the prisoner, that he was insane at the time the homicide was committed. Neither is it allowable to give in evidence the tests that were applied during that interview in order to test prisoner's sanity at the time the act was done.

2. The State having proved the homicide, from which the Law infers malice, closed. The defendant pleads insanity, and supports his plea by proof. The State may, by leave of the Court, then offer evidence of express malice.

3. Witnesses other than experts may give their opinions as to sanity or insanity, provided they be accompanied by the facts upon which they are founded. Nor is it wrong for witnesses to state that the prisoner "appeared to be drinking."

4. The Court is not obliged to have the testimony taken down at the trial, read over to medical witnesses to enable them to express an opinion relative to the sanity or insanity of the accused. The proper course is, to ask their opinion upon the facts, hypothetically stated.

5. It is not error in the Court to express its opinion as to the grade of the offence made by the case, provided it is not done in the way of *direction;* and the omission or refusal of the Court to charge the Jury upon a grade of homicide not authorized by the pleadings and proof, is not error.

6. Family and neighborhood reputation is not admissible to prove that the prisoner was permanently injured in his mind, by reason of an injury which he had received.

7. If the condition of a man's mind, when unexcited by liquor, is capable of distinguishing between right and wrong, reasoning and acting rationally, and he voluntarily deprives himself of reason by intoxication, and commits an offence while in that condition, he is criminally responsible for it.

8. "Nor does it make any difference that a man, either by former injury to the head or brain, or constitutional infirmity, is more liable to be maddened by liquor than another man. If he has legal memory and discretion when sober, and voluntarily deprives himself of reason, he is responsible for his acts while in that condition. But if a man be insane when sober, the fact that he increased the insanity by the super-added excitement of liquor, makes no difference. An insane man is irresponsible, whether drunk or sober."

9. The disease called *oinomania* questioned.

10. An inordinate thirst for liquor, produced by the habit of drinking, is no excuse, legally or morally, for the consequences resulting from the indulgence of such appetite.

11. Moral insanity, or irresponsibility for crime, from an inability to control the will, from the habit of indulgence, controverted.

12. This doctrine has no foundation in the Law, and the consciousness and conscience of mankind has in all ages been opposed to it.

13. "If a man has capacity and reason sufficient to enable him to distinguish

**CHARGE OF COURT.** "On a trial of a defendant for murder, it is the **duty of the court to give to the jury the definition of each grade of homicide, and also the law of justifiable homicide, provided the testimony will authorize it;** but where there is no evidence whatever on which the jury could base a verdict finding defendant guilty of involuntary manslaughter, a failure to charge on that subject is not error. (a) The evidence shows a plain case of murder." Freeman *v.* State, 70 Ga. 736 (2).   *   *   *   *   "We hold that the charge should apply to the case by the pleadings and proof, and that, in just such a case as this, to charge the jury as to the crime of involuntary manslaughter would have been as inapplicable to the case as to have instructed them as to the law of arson or robbery." Dozier *v.* The State, 26 Ga. 156; Choice *v.* The State, 31 Ga. 424; Washington *v.* The State, 36 Ga. 222; Hill *v.* The State, 41 Ib. 485, 504, 505; Brown *v.* The State, 25 Ib. 200,

between right and wrong, as to the particular act in question; if he has knowledge and consciousness that the act he is doing is wrong, and would deserve punishment, he is, in the eye of the Law, of sound mind and memory," and the subject of punishment.

14. The opinions of experts is competent testimony; and when the experience, honesty and impartiality of the witnesses are undoubted, their testimony is entitled to great weight and consideration. Not that it is so authoritative that the Jury are bound to be governed by it. It is intended to aid them in coming to a correct conclusion in the case.

15. Where the verdict is fully sustained by the testimony, and the Law of the case has been correctly administered, this Court will not disturb the finding and judgment, especially in a criminal case.

Indictment for murder, in Fulton Superior Court. Tried before Judge BULL, at the October Term, 1859.

At the April Term, 1859, of the Superior Court of Fulton county, a bill of indictment was found and filed, charging William A. Choice with the murder of Calvin Webb.

On the trial of said indictment, at the October Term, 1859, the following testimony was introduced and submitted to the jury, to wit:

*Evidence on part of the State.*

JOHN CASON, sworn, says: The deceased was killed on the 31st of December last; witness and Mr. Webb were walking together; deceased said, don't shoot; witness turned and saw prisoner in the act of shooting, and did shoot very quickly; did not appear like he was going to shoot immediately again, and did not; deceased turned to witness and said, I am a dead man; thinks it was on 31st December last; it was in the county of Fulton; the shooting took place near the Trout House, in the city of Atlanta. After witness and deceased passed, prisoner came on after them and stood on the ground witness and deceased had passed over; witness and deceased were about forty feet from the corner of the public square, next the Trout House, where the shooting took place; it was a rainy day. When witness first saw prisoner, he was standing near the corner of the public square, next the Trout House. The reason why witness turned around as he and the deceased were walking on from prisoner, was, that the deceased said, "don't shoot;" two shots fired. There was nothing said by the parties only what I have stated. Deceased, when shot, turned and walked back toward Davis'

215, 216; Durham v. The State, February term, 1883, in MS.; Jones' case, 65 Ib. 148; Wynne's case, 56 Ib. 113; O'Shield's case, 55 Ib. 697; Brassel's case, 64 Ib. 319; Hooper's case, 52 Ib. 607, 611."   Id. 740.

**DRUNKENNESS AS AN EXCUSE FOR CRIME.** "If the mania, insanity or unsoundness of mind, though produced by drunkenness, be permanent and fixed, so as to destroy all knowledge of right and wrong, then the person thus laboring under these infirmities would not be responsible. **The insanity must be fixed and permanent,** and such we

store, and went only about five or six steps. Witness went to the deceased when he fell; made no examination as to where he was hit; called to others to come, that he was a dead man; does not think deceased breathed after he fell; did not see him move hand or foot. Witness saw the pistol discharged; does not know what kind of a pistol it was; had one barrel, but shot twice. The wound was in the right part of the breast, near the right shoulder; thinks it was in the right shoulder, but not positive; does not think deceased lived more than one minute after the firing of the pistol. At the time of the shooting, deceased was walking nearest to the fence around the park, or public square. This was in December, 1858.

*Cross-examination:* Did not see Mr. Choice at all until after deceased spoke; had passed the corner, but did not see prisoner when they passed; was not walking very fast. Witness and deceased were crossing from the Trout House when witness first saw prisoner; he was on the plank walk; does not know anything Mr. Choice said before Mr. Webb said, don't shoot; thinks Mr. Choice had a hat on—not positive; did not see Mr. Choice until he got to the corner; does not know how he got there; did not hear Mr. Choice say anything. Deceased was carrying an umbrella over witness; they were walking elbow to elbow, but not locked arms. Mr. Choice stood pretty firm; did not see him reeling; looked at prisoner only one or two minutes; saw him fire the pistol. Choice was a stranger to witness. It took place at about as public a place as any in the city of Atlanta; public open place all around; about 20 or 30 steps from where prisoner was standing to the Trout House; about the same distance to the Atlanta Hotel; did not know to whom deceased spoke, when he said, don't shoot; deceased had to look back to see prisoner; saw no other persons in the street at the time, only Choice and deceased. Witness and deceased were passing on toward the *Shed;* prisoner had no umbrella over him; heard no sound from him; did not even hear his voice.

*Re-examined by the State:* When witness turned at the time of shooting, he turned to the right; at this time prisoner had the pistol, aimed, and fired very quick.

Dr. J. F. ALEXANDER, sworn, says: Saw deceased after he was killed; examined the wound upon him; there was only one wound—that of a ball fired from a gun, or pistol, or

understand to be the ruling of this court in Choice *v.* The State, 31 Ga. 424. Undoubtedly this was the common law. 1 Hale's P. C. 32. It is there stated that "although the simplex frenzy occasioned immediately by drunkenness excuse not in criminals, yet if by one of more such practices an habitual or fixed frenzy be caused, though this madness be contracted by the vice and will of the party, this habitual and fixed frenzy thereby caused puts the man in the same condition in relation

something; it took effect in the right breast, just about the shoulder; entered the cavity of the chest; thinks the severing of the large arteries by the entering of the ball caused deceased's death. The examination was made on the same day of the killing; this was in December, 1858; the wound was mortal; thinks from the wound, death would take place in a few seconds; there was no other wound upon deceased. This occurred in Fulton county.

*Cross-examined:* First saw deceased on that day about 10 o'clock; it was raining. There is a disease called monomania or dipsomania, caused by using intoxicating drinks; looks on mania as always the same; but, the exciting cause be what it may, would draw a difference in an act caused by mania, produced by intoxicating drinks, and by drunkenness. A blow upon the head, so as to fracture the brain or produce a severe contusion, may produce "elision" in the brain, so as to act as a predisposing cause to insanity: an attack of insanity always presupposes a recurrence again; every attack increases the severity of them. Insanity, during a relapse, is as when first brought on, and reason is as much destroyed. When this madness and raving is produced by the use of liquor, the liquor is merely an exciting cause. An attack produced by the exciting cause produces unconsciousness, the same as the attack produced first by the blow or contusion. This disease of the brain is liable to relapse by causes over which the patient has no control. An act done in a relapse state is the act and deed of an insane man, and not of a drunken man. Frequently an increased severity of the attack. Elision is caused by concussion, or any violent blow.

An act committed during relapse, if insanity, through liquor, was the exciting cause, it was the act of an insane man, and not of a drunken man. A man in this state of insanity, though produced by liquor, is unconscious of right and wrong. Stupor is apt to follow an act of excitement, and when aroused from that state, is unconscious of what has taken place. When he has fallen into stupor from one of these attacks, and aroused, is apt to be unconscious of what occurred; when he has been aroused from this stupor, and is unconscious of what has occurred, it is evident that he has had an attack of insanity; when it is known that he is subject to such attacks, any moral depressing cause will be likely to

to crimes as if the same were contracted involuntarily at first." 4 Coke, §125 (a)." Beck *v.* State, 76 Ga. 470.

"Though the **charge of the court** was **not felicitous**—and in some respects inaccurate—on the subject of drunkenness, **yet the jury not being misled,** and the evidence being strong and decidedly in favor of the verdict, **a new trial should not be granted."** Wise *v.* State, 34 Ga. 348 (3), 354.

"For myself (Jackson, J.,) I think that a man can not voluntarily

bring on a relapse of insanity, such as disappointment in business, etc.

*Re-examined by the State:* Oinomania is different from Mania-a-potu: the latter is caused by strong drink alone. When thus produced, he is unconscious of what he does; and if a man is conscious of what he says, it is evident that he is not laboring under oinomania or insanity. A man laboring under monomania can not connect events, etc. It is only when the sense of danger is the cause of insanity, that the patient has the dread of danger. When a patient gives evidence of a sense of danger, it is an evidence that he is not in a state of mania. A person insane is unconscious of danger; and showing a sense of danger, is evidence that he is not insane. The principal symptoms are a total loss of mind. There is no species of insanity in which a man can talk, and think, and act coherently, except in monomania. If a man talks, acts and thinks coherently, that is the highest evidence that he is not insane. A man afflicted with monomania can not recollect and narrate things and acts coherently. If a man can do this, it would be one of the highest evidences that he was not insane; might remember facts, but could not recollect and narrate them in the order in which they occurred; could not reason upon them, and could not be reasoned with, so that his conduct could be controlled by argument of others. There are always physical appearances of insanity: the eye is the greatest index. A man who is accustomed to it, can tell when a man is afflicted with insanity. Where you find any one under the influence of drink, is raging and raving, he is predisposed to insanity, and might be brought on; liquor is the proximate cause, and the constitutional or accidental predisposition is the remote cause. Extreme drunkenness causes deep stupor. If, on awakening, the person shows a recollection of what took place before the stupor, this would be an evidence that it was not insanity; when recovering from stupor, a person is as oblivious as from insanity. However drunk a man may be, he will understand something you may say to him; but if insane, he will not. One of the symptoms of dipsomania is thirst for drink—an irresistible thirst for drink. If the causes which rendered the person insane were those of danger, it would be almost certain for the patient to be sensible of danger in cases of relapse. Much that witness has said in reply to solicitor-general, has been in

---

make himself so drunk as if he shoot and kill another without provocation, the crime will be graded or reduced from murder to manslaughter; or if he shoot at another without provocation the crime can be made by drunkenness less than assault with intent to murder. The statute is plain that **voluntary drunkenness shall be no excuse,** and if it be made to lower or grade the crime, to lessen it in any case whatever, it is thereby made some excuse; and that, pro tanto, fritters

Choice vs. The State of Georgia.

reference to mania generally. When witness, in reply to solicitor-general, said that an insane person could not reason, he did not mean to say that he could not have ideas. Insane persons generally exhibit a good deal of cunning and shrewdness. Insanity, in its types and symptoms, differ as subjects differ; can not lay down general symptoms. The fact that a person exhibits, or seems to exhibit, shrewdness, does not rebut the idea that he is insane, and irresponsible. Insane persons commonly sing songs, speak speeches, and then, when told of it, be perfectly unconscious. The songs and speeches, they have learned when sane. Insane persons frequently exhibit a physical power when they have no moral power; insane persons know that fire will burn a house, a pistol will shoot, but not sensible of the criminality and moral wrong, and will show a disposition to use them. A person acting under the influence of mania, as described by the witness, his acts will apparently be the result of consciousness, and a distinction between right and wrong, when the fact of being so is entirely the reverse. A man can not be drunk, unless from the effects of liquor; and if from drugs, it is insanity. Persons afflicted by excessive use of intoxicating drinks, give evidence of fear and apprehension.

JAMES R. JACK, sworn, says: The killing took place on the 31st December, 1858, between 10 and 11 o'clock. Witness' attention was first attracted by the fire of a pistol; witness was in the store of J. C. Davis; witness looked down; saw Mr. Choice down there; saw Mr. Cason to the right of Mr. Choice, and at the same time saw Mr. Webb walking off from Mr. Choice. Witness looked down to the Trout House to see who he was shooting at; saw Mr. Choice with his pistol presented at deceased; saw deceased step some two or three steps after first fire; stepped off the plank walk and looked back at Mr. Choice; stepped two or three steps on toward the Atlanta Hotel. When deceased had stepped one or two steps, he looked back, and Mr. Choice fired the second time at him, and hit him somewhere about the right shoulder; when prisoner fired, and ball struck deceased, it staggered him, and deceased turned around facing the store, made one or two steps, and said, I am a dead man; he commenced getting weak in his right leg, and fell on his face inside his umbrella; prisoner still stood there with his pistol, and moved it around as deceased walked. After deceased fell, prisoner

away the solidity and power of the statute. I agree fully with the decisions of this court in 17 Georgia, 146; 25 Ibid. 527; and 31 Ibid. 424; and with the dissent of Judge Lyon from the judgment rendered in 29 Ibid. 594." Estes v. State, 55 Ga. 32.

**DRUNKENNESS—OPINION OF WITNESS AS TO.** "Where it was competent to prove drunkenness, **a witness may give the facts on which**

dropped his arm he had his pistol in, and, as he stepped off, hung his head and put his hand up to his face. Some one came running down the street, went toward prisoner, when prisoner stopped, and moved his pistol around for him to come on. After the man stopped, prisoner went on, stopped on the sidewalk, and Maj. Nickerson said something to him; he waived his pistol at him, and went on down the street on the sidewalk; walked on down the street some thirty or forty yards, and turned out into an alley below where Masonic Hall is now being erected; the alley is some twenty or thirty yards from the Trout House; turned up the alley; it is a private place. The first witness saw of prisoner on the morning of the difficulty, he was coming down the steps at Mr. Ennis' barroom; did not see deceased and Mr. Cason; it was between the firing of the pistols about as long as a man could walk ten or twelve steps; deceased was going from prisoner when the second fire was made; witness was about seventy feet from prisoner at the second firing; the second fire was a deliberate aim; seemed to be very particular to take aim.

*Cross-examined:* When he speaks of coming down steps, he means steps on sidewalk; when he first saw him he was going down Decatur street, and when he fired, he continued to walk crosswise down same street; did not hear anything prisoner said; he did not seem to be saying anything; just carried his pistol along in his hand; did not try to hide it at all; walked as firmly as he ever saw him; had no umbrella over him; carried his pistol along in regular sort of way; had on common cloth coat (dark). Last witness saw of him until arrested, was at alley; walked through the mud across the street; saw the crowd—the mob; it was a very large crowd; made great noise; the crowd was around the fence about fifteen feet from the calaboose; they were around there some hour or so; thinks at the time of the shooting, that it had quit raining; when prisoner fired he was quarter across the street, and got on the sidewalk, nearly opposite the ladies' entrance in the Trout House; when he got on the sidewalk, prisoner walked fast; heard some of those who were around the calaboose hallooing, hang him! hang him!

THOMAS GANNON, sworn, says: The killing took place in the county of Fulton, 31st day of December, 1858. Saw

he bases his opinion and from those facts state what that opinion is." Pierce *v.* State, 53 Ga. 365 (3), 370.

EXPERT TESTIMONY. "The testimony of experts or professional witnesses is often very important, and justly entitled to great weight in a cause, but it must have its legitimate influence by enlightening, and governing the judgment of the jury, and must be of such a character as to outweigh, by its intrinsic force and probability, all conflicting testimony. The jury can not be required by the court to accept,

prisoner coming from Atlanta Hotel to Trout House; came within seven or eight steps of Mr. Webb; took his pistol from his coat pocket and elevated it and shot deceased right over his right shoulder; second shot that he fired was about three-fourths of a moment; at the same time, deceased stepped off the walk towards the Atlanta Hotel; thinks second shot took effect; deceased went off about twelve or fifteen steps and fell to the ground; Mr. Choice came from where he stood at the time he shot him, and passed by the Trout House to the next dwelling-house; turned from there across to the other street through the back lot. Deceased and Cason were walking towards the passenger depot; prisoner was coming from the Atlanta Hotel barroom, and came up within about thirteen steps from the walk that leads from the Trout House to the passenger depot; when he fired first, deceased and Mr. Cason were coming up from the City Hotel, and turned at the Trout House to the passenger depot; saw prisoner come out of the barroom of Ennis' a short time before the difficulty. Witness was standing at the door of the Trout House, about twenty-five or thirty steps off.

*Cross-examination:* When he first fired he was about thirteen steps from him, and walked six or seven before the second fire, further off; Mr. Choice did not walk any nearer to Mr. Webb, but continued in the same direction; Mr. Choice had a wild, excited look; seemed really very much excited; prisoner crossed the street, after he fired, to the sidewalk on the other side; there is no sidewalk on the side of Decatur street where he was at the time of the firing.

F. B. BOGGUS, sworn, says: He was passing down Decatur street opposite the Atheneum; heard a pistol fire; looked in the direction, and saw Mr. Choice in the smoke; saw Mr. Webb looking back over his shoulder; deceased kept on the crossing in company with another gentleman; saw prisoner put his pistol down on his leg like he was cocking it, and again raised it up and fired; saw deceased throw his hand up behind; deceased turned round and walked toward witness, and said he was a dead man; walked some seven or eight steps and fell. Prisoner then turned and walked across Decatur street toward the lower end of the Trout House; a gentleman came running down the street; saw prisoner turn with his pistol in his hand; witness jumped into the house of Davis; thought he might shoot again. When witness came

as matter of law, the conclusions of the witnesses instead of their own." In Choice's case, 31 Ga. 425, it was said: "The opinion of experts is competent testimony; and when the experience, honesty, and impartiality of the witnesses are undoubted, their testimony is entitled to great weight and consideration. Not that it is so authoritative that the jury are bound to be governed by it. It is intended to aid them in

out of the store, saw prisoner going down the sidewalk; saw him turn from the sidewalk; deceased was going from prisoner; never heard but one word spoke—that was by deceased, that he was a dead man; at the time the man came running down the street, Mr. Choice brought his pistol around in the direction of him, and he stopped.

State here closed for the present.

H. H. BLAKE, sworn, says: He lives in Floyd county, Georgia; was in Rome latter part of December; was there about Christmas; saw prisoner there during that time; prisoner appeared in a condition, from the looks of his eyes, that he was not right; had a wild and dangerous look; looked wild out of his eyes; did not want to have anything to say to him; had the appearance of a wild, crazy man.  About Christmas times he did not look like he did formerly; thinks he must have known what he was doing, but still, he did not look right out of his eyes; was not acquainted with prisoner.  It was a few days after the killing before witness heard of it; it was the latter part of December, 1858; had seen prisoner frequently, but was not intimately acquainted with him.

*Cross-examined:* Was not with prisoner much about the time he testifies; don't think he ever spoke to prisoner, only perhaps to say howdy; witness saw prisoner frequently about the Choice House, and in the streets at Rome.

DANIEL S. PRINTUP, sworn, says: He is acquainted with prisoner; has been acquainted with him for about eleven years; thinks in the latter part of 1850; he heard of a horse running away with him in a buggy; thinks it was in the fall of 1850.  Witness, when he heard of it, immediately went out to where the accident happened; when witness arrived there, they had carried him (prisoner) to the house of Mr. Mitchell, near where he got loose from the buggy.  When witness went into the room, prisoner was lying on a pallet, very seriously injured about the head; the injuries seemed to be produced, as witness concluded from appearances, from being dragged along; the blows were *contusion and concussion;* the place where the horse ran away was descending some two hundred and fifty or three hundred yards; the ground was uneven; there were signs of the dragging on the ground.  When witness first saw him lying on the pallet in the house, he (prisoner) was very much mangled, and bloody, and did not seem to know what was going on about him; prisoner re-

coming to a correct conclusion in the case."    Baker *v.* Richmond City Mill Works, 105 Ga. 312.

"**Medical men are permitted to give their opinion as to the sane or insane state of a person's mind,** not on their own observations only, but on the case itself, as proved by other witnesses on the trial.  And while it is improper to ask an expert what is his opinion upon the case on trial, he may be asked upon a similar case hypothetically

mained in that state of unconsciousness for some four or five weeks, witness thinks, and when he seemed to recover from it, he did not seem to recover the faculties of his mind to the same extent he had before; prisoner's life was despaired of for some time—did not think he would live; during the whole time of his danger, he did not seem to have his proper mind —raved, and was delirious; since that time, when he (prisoner) has been excited from drinking, or any other exciting cause, he did not seem to be in the exercise of a sane mind —seemed to throw him back. Prisoner's mother, about the time of the homicide, was very low, and at the point of death. When she was first taken, prisoner took charge of her business to a considerable extent; thinks before the difficulty occurred, prisoner left Rome some two or three days; is not positive as to number of days; before he left Rome he had been drinking; did not see him drink, but saw him as he was recovering; seemed, when he left, to be somewhat out of his mind—in rather a wild condition, and tried to prevail on him to remain at home; could not reason with him so as to induce him to remain at home; he did not act as he formerly did; his mother entreated him (prisoner) not to leave home because of his condition; he (prisoner) was sober at the time he had charge of his mother's business; witness considered prisoner in a dangerous condition at the time, to leave home; prisoner had been in the habit of carrying a pistol (a repeater); the family had endeavored to prevent his carrying it. Just before he left Rome, and before the homicide, he (prisoner) tried to get a pistol, but no one would let him have one, owing to the condition he was in; when in the condition alluded to, he would injure a friend as soon as a foe; prisoner threatened on one occasion to kill witness without any reason whatever.

*Cross-examined:* When prisoner threatened to kill witness, it was three or four years ago; he had been drinking at the time. When under the influence of liquor, he is a very violent man; when in the first stages, he is not violent, but is in the latter; when he is in this violent stage of drinking, he is a very dangerous man to be about, to either friend or foe. Witness has known of his loss of mind some four or five times since 1850; the exciting cause is generally liquor. There was one time, the witness thinks, when it was from another cause; he was gloomy and moody; did not drink,

stated." Choice *v.* State, 31 Ga. 468. In the present case the expert witness testified as to his opinion based, to how great an extent does not appear, upon what he had heard. The jury had no possible means of knowing whether his opinion was not based upon an assumption of the truth of rumors or reports which the jury did not believe to be true, or of whose truth there had been submitted to them absolutely

but seemed to avoid society. On the other occasions, the exciting cause was liquor; can not say it was at that time; he thinks it was from some other cause; the prisoner had not been drinking; it was after Christmas, when prisoner left Rome; thinks it was two or three days, or more; not less than two days before. Witness conversed with prisoner, four or five years ago, about the injurious effects of drinking liquor, and he seemed to have a desire to abandon it. Prisoner's mother was very low at the time he was in this gloomy condition in October or November, before the killing; prisoner was one of the clerks in the Senate the latter part of the session, last Legislature. At the time he speaks of prisoner's being gloomy, he is satisfied, from his manner and general appearance, that he had not been drinking; at the time he (witness) speaks of prisoner being gloomy, he did not act as he usually did; witness' inducement to think he was out of the way was, that he seemed depressed, and did not mingle in society; when prisoner conversed with any one, it was rational, with the exception of one time, which was about some money; prisoner objected to his mother depositing money in the bank for safe-keeping, and his conduct was irrational; witness knew no reason why it should not be deposited; can not say whether or not prisoner knew at the time the difference between right and wrong; does not think at the time referred to about depositing money, he was in his true state of mind; might state at another time there was a writing drawn, and prisoner did not seem to understand the reason of the writing— the connection; prisoner became furious about his mother depositing his money in the bank.

JOHN M. GREGORY, sworn, says: He is acquainted with prisoner at the bar; is a practicing physician; saw prisoner at the time of his injury, in 1850. When witness got to him (it was a mile from Rome), he, prisoner, had been taken into a house, some one hundred yards from where he fell. Found him very much bruised and dirty; his clothes were torn bad; had the appearance of having been dragged some distance. After washing the brow, found one wound just across the forehead, a deep wound; several others, smaller, on his head. He was generally bruised. He, prisoner, was not rational at the time witness saw him first; he was not rational for about two months, with slight exceptions. From examination made, thinks there was compression of the

no evidence. It is therefore clear that the question was improper, because it allowed an opinion based upon what the witness had heard of the accused, and that the evidence was inadmissible." Flanagan *v.* State, 106 Ga. 111-12. * * * * * **"Where the question at issue is one of opinion merely, as that of sanity or insanity, a witness who has "knowledge of the facts and their surroundings," "may give his opinion by showing the reason for it,** whether he be an expert or not."

brain; that the inner temple of the brain had been broken; and was apprehensive that he might have concussion of the brain. Prisoner was treated for concussion of the brain. Dr. Douglass and Dr. Coleman, and also Dr. H. V. M. Miller, were in the treatment of the case with witness. Dr. Hamilton also knew about it—he is dead. The reason why Dr. H. V. M. Miller is not here is owing to Providential interference; Dr. Douglass lives in Dougherty county; Dr. Coleman is in Texas. Witness and Miller are the only ones who now live in Rome, Georgia. Has been acquainted with prisoner since this injury; has been in the house with him frequently; has acted very much like a mad man, when excited by liquor or other causes. Knew prisoner before he received wounds on the head; do not think he fully recovered his mind; he has been a changed man since. Has seen him perfectly insane, when under the influence of liquor, and acting unreasonably when not drinking. When he recovered from these periods of insanity, he seemed to have no recollection of what occurred. From witness' knowledge of the disease of prisoner, from effects on the head, when drinking, he is both drunk and insane. Knows of Mr. Choice taking charge of his mother's business about four months before the killing. Prisoner acted strangely then, particularly as his mother was in the condition she was. Saw prisoner a short time before the killing, and before he left Rome for Atlanta; had been drinking several days; does not know that he was drinking; was acting like a man who had been drinking; also acted like an insane man. Witness states that, if prisoner was, on the morning of the killing, shooting at a servant about the hotel, and waving his pistol about, telling a friend to prepare to die, he would say that no sane man could act so; and after the homicide, went to sleep in the calaboose, and slept soundly, while the mob were clamoring for his life. From these facts, coupled with witness' own knowledge of the prisoner, he (witness) would say, as a physician, he was an insane man. From witness' knowledge of Mr. Choice's condition at the time he left Rome, if he came to Atlanta in the same condition and shot down a man publicly in the streets, and after being carried to the calaboose, went to sleep, while a mob was clamoring for his life, he would say no sane man could act so. Witness says, as a physician, he thinks that when prisoner left Rome to come to Atlanta, he

Killian *v.* Augusta & K. R. Co., 78 Ga. 749; Civil Code, §5285. When, however, an expert is asked to give his opinion on facts not coming within his own knowledge, the question should be hypothetical. Southern Bell Tel. Co. *v.* Jordan, 87 Ga. 69." **"A scientific expert, who has** observed none of the facts for himself, **should give his opinion on a hypothetical case similar to that before the jury, and not on the actual**

was an insane man. Thinks he had no pistol when he left Rome; and his reason for thinking so is, that he asked witness for one the night before, and witness refused to let him have it. There was a difference in Mr. Choice and other men, when he was drinking.

*Cross-examined:* Thinks prisoner left Rome on the 28th or 29th of December, 1858. Is a brother-in-law of Mr. Choice, and tolerably well acquainted with Mr. Choice's habits. Thought, at the time he left Rome, the exciting cause of prisoner's insanity was liquor. Thinks liquor was the exciting cause of insanity, when produced by liquor. Mr. Choice is a very violent man, when drinking.

*Re-examined by defense:* When a patient is afflicted with dipsomania, he has a thirst for drink which is almost irresistible. When prisoner is in the first stages of drinking he is companionable; when in the latter stages, becomes more violent. Prisoner's conduct was not rational at the time he was waiting on his mother, and when he was not drinking. He (prisoner) would sit by his mother, and shed tears, and next moment would not act consistently. Thinks prisoner's mind would be more easily affected than other persons', by having received wounds on the head. If prisoner was predisposed to insanity, from injuries on the head, he thinks that liquor was the exciting and immediate cause. Oinomania is a thirst for drink, after the use of it; oinomania is a class of monomania—thinks, but not positive, not having examined the subject recently—is inclined to think that prisoner was afflicted with oinomania; is most positive of it. Thinks that a person afflicted with oinomania is insane upon one subject, but sane upon other subjects, according to his recollection of the authorities on this subject.

S. B. LOVE, sworn, says: He saw Mr. Choice on the evening of the same day of killing, in calaboose; he was lying down, and did not get up while witness was there; found him lying down, and left him lying down. Don't know what he was lying on; was lying still like asleep, after the crowd dispersed; first, witness went in after this crowd; came back again, the crowd was assembled at the calaboose; when witness got there, after he dispersed the crowd, went in and found prisoner in the condition described.

*Cross-examined:* Did not stay in the calaboose only a minute or two; did not see any chairs, or anything to sit on

case as if he were a juror instead of a witness." Griggs *v.* State, 59 Ga. 738; Choice *v.* State, supra." Id. 112-3.

**EXPERT TESTIMONY—CHARGE OF COURT.** "Where there was expert testimony in the case, and upon request of counsel to charge concerning it, the court did so, and charged correctly thereon, **if counsel were not satisfied and desired fuller instructions** to be given on that

in calaboose.    The crowd was rather quiet when witness went in.

Dr. B. F. Bomar, sworn, says: He had conversation with prisoner the day previous to the homicide; was going home from his office, saw prisoner near the Atheneum.    Prisoner came out to witness as he was passing and said his mother was laboring under some paralytic affection, and he thought it would be mortal; that she would not recover.    Prisoner looked very much dejected, so much so that he (witness) remarked it to his wife when he went home.

*Cross-examined:* Prisoner seemed to be very sane, spoke rationally, saw nothing to make him think prisoner was insane, only his manner, and seemed dejected; did not talk like a man that was out of his mind; but there was a peculiar expression about his face, an indescribable expression between dejection and despair; did not know at that time of the peculiar design of prisoner's brain.    When a man speaks rationally, and acts rationally, he would not consider the expression an evidence of insanity alone.

John W. Hooper, sworn, says: Was acquainted with prisoner prior to the injuries he received upon his head, in 1850; he was considered a smart boy, above ordinary capacity; saw him soon after the hurt; saw wounds; witness' conclusion was, that it was uncertain whether or not he, prisoner, ever recovered his mind.    Witness inquired of prisoner how the matter occurred, and prisoner could not tell him; that he had no recollection of any of the events of the injury; could not recollect getting in the buggy or anything connected with it.    Considerable time after the occurrence, probably about twelve months, when this conversation took place between prisoner and witness.

*Cross-examined:* Has frequently seen prisoner since the hurt; has considered him a man of intelligence, more than ordinary; it was eight or nine years ago, when witness thought it uncertain as to whether or not prisoner recovered his mind.

H. A. Gartrell, sworn, says: Was acquainted with prisoner before the wound received, in 1850.    Has roomed and boarded in the house with his mother, and went to school with him; before hurt, he was a smart, promising young man, witness always thought.    Thinks it was about 1851 or 1852, prisoner spoke to witness about going into some business, but said he did not have the money; witness asked him

point, **they should have made request therefor."**    Bertody *v.* Ison, 69 Ga. 317 (3), 320.

"**In charging upon expert testimony of physicians** introduced in behalf of the State upon a material question of fact at issue, it is **error** for the court, after charging the jury that such testimony is dependent upon the degree of the experience and honesty and impartiality of the witnesses who testified, **to further instruct** them **that** "where **such** ele-

where the money was he got from his grandfather, which was about $3,000; said he had made way with it, but did not know what he had done with it; said he presumed that he had lost it gambling; said he did not know; said he made way with it while his mind was affected from a hurt he received on his head; and remarked at the same time, his mother or some of his friends ought to have taken the money away from him, knowing his condition. Witness' opinion is, that his (prisoner's) mind has been affected, more or less, ever since he received the injury on his head; it is increased when under the influence of liquor. Prisoner used to be very sociable before the hurt, a pleasant man; since, morose, ill-natured; has seen him (prisoner), last summer promenading his mother's piazza, hours at a time, solitary and alone; the most gloomy and mysterious looking man I (witness) ever saw.

*Cross-examined:* Has not spoken to prisoner for five or six years until a few weeks past; boarded at his mother's hotel all the time; some little difficulty occurred between witness and prisoner which caused witness not to have anything to do with him. It was a trifling, frivolous matter they fell out about; prisoner was very exacting and insulting, and he did not wish to cultivate feelings of intimacy with him. At the time of the difficulty he did not think prisoner insane, but thinks that his mind was more or less affected all the time; this affection of the mind had more influence upon his disposition than upon his intellect. Has never seen him, only when he was under the influence of liquor, insane.

W. W. SPALDING, sworn, says: Has had charge of an institution where he had insane persons frequently under his charge, in Hartford, Connecticut, and was bookkeeper and disciplinarian four years and four months, in the house of correction. Saw prisoner the day of the homicide and the day before; saw the officers have him arrested, and noticed him particularly. His eyes were very glassy and seemed very strange, so much so that he called the attention of several to it. He (prisoner) came by the hotel; they were bringing him down Pryor street; the crowd was very much excited; he watched the expression of prisoner's countenance, to see if any change came over it; he saw none; it was so evident that witness called the attention of several gentlemen to it. Witness' impression was, that the prisoner

ments are undoubted their **testimony is entitled to great weight and consideration.**" Merritt *v.* State, 107 Ga. 676 (4), 680.

"Ordinarily **the court should not instruct the jury what particular testimony before them is, or is not entitled to great weight** or consideration, especially where there is no statute or rule of law stating that the particular testimony in question should be considered by the jury as being of great weight." See also, in this connection, Raleigh

was crazy; at the time of his eyes looking so glassy, his head was thrown back.

*Cross-examined:* Says there was a great deal of excitement, a large crowd, some of them crying out: "Hang him! hang him!" Prisoner took breakfast with witness in the restaurant in the Trout House the day of the killing, about half-past ten o'clock. Prisoner came to witness night before to borrow a knife; said he was going out of town; did not see much of prisoner night before; did not see him drink anything I recollect of; Mr. Thomas or John Gannon were keeping the barroom at the Trout House; the time witness saw prisoner in the custody of the officers was about half an hour after the killing.

JOSEPH THOMPSON, sworn, says: He keeps the Atlanta Hotel; saw prisoner there the day of the homicide; heard two reports of a pistol at the hotel, went to see what was the matter; saw prisoner coming down stairs with a pistol in his hand; witness told prisoner he had better go to his room, that he would shoot some one at random; saw some shots in the room in the hotel; prisoner, when witness met him, said he had been shooting at some damned woman; after this, was mixing up some medicine and heard the report of the pistol that did the deed; it was not twenty minutes after. Was formerly practicing physician. It is very doubtful whether he knew what he was about; don't think he would have conducted himself as he did if he had. It was not more than twenty minutes after witness spoke to prisoner, he heard the shots that done the deed. Prisoner seemed to be wandering about the house and yard that morning.

*Cross-examined:* Don't think he saw prisoner drink any that morning; seemed to be on the order of a maniac; witness don't know from what cause; did not see anything of the difficulty the night before; has seen men in a high state of excitement, acting like a maniac; has known of a case or two where young men were equally as desperate from drinking; prisoner was wandering about the house and yard that morning; did not seem to know in what part of the house he was; the shooting was some sixty feet from his (prisoner's) room; prisoner did not seem to stagger when witness told prisoner to go to his room, that he would shoot some one; said to witness he would not shoot him; it was about 9 or 10 o'clock, when this all occurred, in the morning;

& Gaston Railroad Co. *v.* Allen, 106 Ga. 572; Ryder *v.* State, 100 Ga. 529 (6), 533; Phoenix Insurance Company *v.* Gray, 113 Ga. 424; Wall *v.* State, 112 Ga. 336 (2); In Bourquin *v.* Bourquin, 110 Ga. 440 (3), it was held that it is not proper for the judge to inform the jury that particular evidence is entitled to great consideration, but he should leave them free to determine for themselves the weight to be given it." Calvin *v.* State, 118 Ga. 75.

left prisoner and son, G. H. Thompson, standing on the steps of the Atlanta Hotel, near John Ennis' barroom. Prisoner has boarded with witness about one year, in all; never has seen anything to warrant him in thinking prisoner was insane; has known persons who had had concussion of the brain which produced convulsions; afterwards relapses affect them in the same way, sometimes in a comatose state.

THOMAS J. ECHOLS, sworn, says: Saw Mr. Choice on the morning of the killing; saw prisoner present his pistol at two or three; presented it at witness twice, and said to witness he had to die; witness talked a little rough to prisoner, and made him put the pistol up; witness and prisoner have always been friendly; he seemed, from the way he done, he did not know his friends from his foes, and did not care; said to witness you may prepare to die, I am going to shoot your head off; the pistol was capped, cocked and he had his finger on the trigger; witness caught the pistol and put it up.

*Cross-examined:* Occurred at the barroom of the Atlanta Hotel—Ennis' barroom; prisoner appeared to be drunk; witness supposed him drunk, or he would not have done it. Did not know of any affection of his (prisoner's) head, and did not see him drinking; his appearance was about the same as when he had seen him before, when he had been drinking.

M. N. BARTLETT, sworn, says: Prisoner was always the most sensitive man he ever saw, he thinks; was at a party on an occasion, and witness, prisoner and another young man went home with some ladies, and on their return home, the young man was teasing Choice about talking to the young lady all the time about the weather; it affected prisoner to tears, and prisoner said to him that he did not think he ought to treat him that way as a friend. It was a long time before they could get Choice reconciled. Choice was sober at this time.

*Cross-examined:* Has known Choice very intimately for several years, and considers him a man of promise and talents, but subject to eccentricities; never has seen him, when he considered him insane. Witness considers him, when drinking, the most dangerous man he ever saw, both to friends and foes; he looks much like a lunatic, when drinking; he scarcely ever staggers; remembers to have gone to

**INSANITY AS AN EXCUSE FOR CRIME.** "The insanity which the law recognizes as an excuse for crime, must be such as dethrones reason, and incapacitates an individual from distinguishing between right and wrong." Brinkley v. State, 58 Ga. 296 (4), 300.

**Reputation as being of unsound mind.** "There was no error in the refusal of the court to allow the witnesses to testify at the trial, that the defendant was generally regarded as a man of unsound mind,

Choice vs. The State of Georgia.

his room on one occasion, when it was said, he (prisoner) had got into a scrape, found him lying down on the bed; prisoner asked witness what he had been doing; did seem like a drunken man; for a long time, afterwards, observed signs of drunkenness; prisoner, after one of these sprees, would swear he would quit drinking, and witness thought he would; he would quit for a month at a time; when he was under the influence of liquor, he was very likely to take offence; was very peaceable when sober.

*Re-examined:* Did not know anything about Choice being injured on the head; he (prisoner) always seemed sorry after one of these sprees; has seen prisoner, when drunk, when he was perfectly reckless and a maniac; when witness called upon prisoner in his room, prisoner had no recollection of what he had done; the crying spoken of, was about three years ago. When they went from Atlanta Hotel towards the theater, he seemed to be sober, but when they got in the theater, prisoner commenced hallooing "boots" which caused witness to think he was drunk. Has heard prisoner say that he frequently got into these melancholy moods, when he avoided friend and foe.

H. W. Brown, sworn, says: He heard Spalding's description of prisoner of the day of his arrest. If a man should be insane and relapse, and it was to resemble the original attack, he would pronounce him insane; symptoms of a relapse are similar to the original attack. What is dipsomania? Answer: it is a crazy desire for stimulants. How is it produced? Answers: 'tis congenital, accidental, or acquired by accidental injuries, and among others, such as has been mentioned by other witnesses; the authorities are, that, when afflicted in this way, the patient has no control over himself, or when driven to drink, and having indulged excessively, he is insane or a maniac; a maniac can not be competent, and I would consider him as fully incompetent. Taking all the facts as true, which have been testified to be, would regard him in one of those paroxysms of recklessness of mania. Witness regards him, in such a paroxysm, as a maniac, and does not consider a maniac capable of very correct decisions.

*Cross-examined:* In oinomania, witness thinks, a patient has the power to control his thirst, and has control of himself; witness thinks there is no such disease as oinomania; this is

and that his reputation was that of a person of unsound mind, before the commission of the alleged offense. Choice *v.* The State, 31 Ga. Rep. 424." Brinkley's case, supra, 58 Ga. 297 (1).

"**We do not think that the sayings of the testator were admissible to show the unsoundness of Gray's mind.** On an issue of devisavit vel non, such sayings to show the conditions of the testator's mind are admissible, of course, because the best evidence of his sanity would be the manner in which he would talk, and what he would say on different

his opinion against the weight of medical authority; and if a man is coherent in his thoughts and ideas, he would consider him a sane man; if they think and act coherently, it is the highest evidence of sanity, taken apart from his other acts on evidences of sanity; if at the alleged moment of insanity the patient could narrate things coherently and give the relations of cause and effect, it is the highest evidence of sanity; a man may be sane at one moment, and the next crazy as a bed-bug; a patient may be lucid for a few moments at a time, and then relapse again; at the time insanity is alleged, if the patient can be reasoned with, and controlled by reason, then he is sane at that time. Witness does himself believe that a thirst for drink is not properly a mania, but mania may be produced by drink; sometimes the subjects of mania recollect, and sometimes not.

*Re-examined:* If a person affected, as in this case, is crazed by drink, he would call him a maniac at that time; if witness had reason before to believe a man a maniac, the circumstance of his escaping through an alley would not, in his opinion, disprove it, nor would his recollection of it afterwards be an evidence of sanity; sometimes maniacs manifest a great deal of cunning; alcoholic stimulants sometimes produce insanity as much as any other cause.

DR. WILLIS WESTMORELAND, sworn, says: That he knew the prisoner at the Bar; has heard the testimony of the condition of the parties in this case, and taking the whole of the circumstances as declared to be true, it is witness' opinion that the prisoner was not rational at the time of the commission of the deed. In the winter of 1857 or '58, witness was in Trout House bar-room, with two or three gentlemen; during which, Choice came in and called for something to drink; the barkeeper told him he would wait on him directly; prisoner then drew his pistol, presented it at the barkeeper and bursted a cap, and immediately turned, and, without saying a word, presented it at another gentleman, and witness caught his arm and arrested him, and told him he was acting very imprudently; prisoner then stated that if witness said so, he would desist, as he believed witness was a gentleman; it was a man named McGee, as witness thinks, that he bursted the cap at, and thinks it was Mr. Lockhart at whom he presented the pistol.

*Cross-examined:* In some particular constitutions, liquor

subjects of conversation. But, on the question of the sanity of other persons, particularly where title to property is involved, it has been ruled by this court that family reputation and hearsay of all sorts are inadmissible. See 6 Ga. 291; 9 Ga. 539; 31 Ga. 424."   Gray *v.* Obear, 59 Ga. 682 (4).

"Insanity was not pleaded. Had it been, the record does not show that the plea would have been sustained. **If the defendant deliberately**

may make as perfect maniacs as any other causes; thinks that prisoner was drunk at the time of the difficulty in the bar-room.

*Re-examined:* There are cases when, in an injury of the head or concussion of the brain, the least excitement will produce insanity, which generally subsides when the cause subsides; there are cases of monomaniacs, when they may be conscious of what they do, and that they will be punished, if detected, for it, who are yet irresistibly impelled to do it. In case of injury to the brain, when liquor produces insanity, the liquor is the exciting or prominent cause, and the injury the remote or predisposing cause.

Dr. Joseph P. Logan sworn, says: That he heard the testimony of Dr. Gregory and Col. Printup read, in relation to the condition of the prisoner, and the testimony of Thompson, Gartrell, Spaulding and Echols, and, taking all the facts to be true, he should consider the prisoner irrational at the time of shooting deceased. There is a difference between irrationality and insanity; in cases of insanity produced by lesion of the brain, and of relapses from exciting causes, the relapse would partake of the character of the original insanity.

*Cross-examined:* There are cases of certain constitutional condition when the excessive use of liquor will produce as genuine insanity as any other cause. When an individual has been in the long-continued use of alcoholic liquors, it will produce insanity, and thinks it may produce permanent injury to the brain, and a man may thus become as perfect an idiot as in any other way. All these facts may be as correctly explained by drunkenness as by any other cause of insanity. The excessive use of liquor may produce this glazing of the eye, and may produce very much the same appearance as insanity. Although the authority recognizes oinomania as one specie of insanity, witness' individual opinion is, that a controlling thirst for liquor is not insanity, but the force of habit. Taking all the facts, witness does not pretend to say whether prisoner's irrationality was produced by the injury to the brain or by liquor. In a case when an individual is capable of reasoning from cause to effect, and shows a knowledge and recollection of facts in their connexion of cause and effect—can be reasoned with and influenced by argument—shows a sense of personal danger—exhibits

slew the deceased in revenge for adultery with his wife, he would not be protected by the fact that he labored under a delusion as to her character for virtue. If he is now a lunatic he can be removed to an asylum on proper proceedings had therefor." Hill v. State, 64 Ga. 454 (3-a), 471.

"The defense being general insanity, and there being no evidence of special dementia, or that the accused was laboring under any de-

coherency of thought and speech, and a knowledge of what has passed during his supposed insanity—witness would think these evidences of sanity, if those were the habitual states of his mind.

*Re-examined:* The fact that man obeys for a moment the voice of reason, and soon after forgets, and resumes his former conduct, that would be no evidence of sanity, if such were his habitual state. When, in addition to the organic change of the brain produced by liquor constantly used, there had been also a lesion of the brain by a hurt or otherwise, perfect insanity would be more likely to occur by using liquor. In this perfect state of insanity the subject can not distinguish between right and wrong any more than if he were insane from any other cause. The thirst for liquor, or dipsomania, I do not consider mania, but when it is yielded to in these supposed conditions of organic change in the brain, it may constitute insanity proper. The authorities represent the thirst for liquor as irresistible when there is oinomania; do not know that the mere fact of the brain having been injured would be conclusive evidence of this irresistible thirst; if the subject presented different characteristics after the injury from what he did before, this would be evidence of permanent injury for lesion of the brain.

### Rebuttal.

In the supposed case, the liquor is the exciting and immediate cause, the injury the predisposing cause, and both constitute the insanity. The organic changes and the injury both are the predisposing cause when the injury resulted in an organic change.

Defence closed.

### The State Reopened, in Rebuttal.

LUTHER J. GLENN sworn, said: I saw prisoner the night before the killing; about 10 o'clock, p. m., I stepped into the bar-room at the Atlanta Hotel; Mr. Webb and Choice were standing at the counter alone; witness stopped at the fire, and as I halted, prisoner turned round and asked if I would not stand security for him in a ten-dollar bail case; I approached the counter and told him I would, and walked up between them and said to Webb that it was unnecessary to take bond, I would see that the ten dollars was paid; Webb, said if I said so it was satisfactory; prisoner then

lusion as to the act committed, there was **no error in charging 'Insanity is where there is a total or partial impairment of the intellect, and to such an extent that the person who is thus affected does not know the difference between right and wrong as to the act that he is committing."** Carr *v.* State, 96 Ga. 285 (2), 287. And see Roberts

asked witness to drink; witness declined; prisoner then asked Webb if he would not join him in a drink; Webb declined also. At that moment prisoner, all of a sudden, commenced abusing Webb, using very abusive language, and cursing; it was a kind of explosion; I immediately got between them and kept prisoner away; my back was to Webb; Choice made no attempt to strike Webb, nor resisted me immediately; I kept talking, till finally prisoner got hold of a glass bottle, and Mr. Macoy went behind the counter and caught Mr. Choice by the hand; I looked round and motioned to Webb to get off. Previous to prisoner taking the bottle, I had told him to have no difficulty, and turned away; when Macoy got hold of Choice, I turned and saw that Webb had a pistol; I took Choice by the lappel of the coat and carried him into the adjoining room, and talked with him some five minutes or more; told him Webb was an officer, and had done his duty; I got him pacified, and told him he ought to go into the room and apologize to Webb; we walked in, but Mr. Webb was not in; I repeated the advice as to the apology, and he said: "Colonel, as soon as he comes in I will do so;" said his cause of complaint against Webb was the amount; do not recollect any threat; his idea in the room with witness was, that he ought not to have been arrested for ten dollars; at the time of the difficulty, prisoner manifested a desire to get to Webb; prisoner was as quiet as I ever saw a man when I left the room, and seemed to know he had done wrong; I heard of no further difficulty; prisoner, from his appearance, had been drinking, but was not drunk by any means; when I went into the room he was perfectly quiet, and spoke to me in a natural voice. Prisoner, in my opinion, was rational at that time; it did not occur to me otherwise; don't think I saw prisoner that day, but saw him within three days before, and conversed with him about going to New York; met him casually, and talked some fifteen minutes; said he had been engaged to travel for a New York house, and promised to call at our office before he left. At the time of that conversation he appeared rational; my acquaintance with Choice was not intimate—I may say limited; never knew him until he came here two or three years ago; I had always considered prisoner sane; had seen nothing to indicate the contrary previous to this difficulty; prisoner is a man of more than ordinary intelligence, I think.

v. State, 3 Ga. 310; Danforth v. State, 75 Ga. 614; Fogarty v. State, 80 Ga. 450; Patterson v. State, 86 Ga. 70.
    **NEW TRIAL—VERIFICATION OF GROUNDS.** "A motion for new trial, even when a rule nisi is granted thereon, is but pleading; and the rule, until made absolute, is not a judgment of the court adjudicating the matters of fact statel in the motion. * * * **The Granting of a rule nisi** for a new trial, and entry of the same upon the minutes, even

*Cross-examination:* I never investigated prisoner's mind; knew nothing of his hurt—nothing of his excitability; never saw him drunk or excited before this difficulty; my knowledge of his insanity is like the knowledge of all other men with whom I am acquainted; just seen prisoner in passing; the longest conversation I ever had with him, I think, was about a little case here in Court; at grocery prisoner treated Webb as friendly as he did witness; saw prisoner have no weapon that night; did not see Webb when he drew his pistol, but saw it in his hand; I inferred from his conduct, that prisoner had been drinking; knew no other explanation for his conduct; don't think he was drunk; did not see him drinking.

## Rebuttal.

It was between 10 and 11 o'clock, P. M., when the difficulty took place.

J. A. HAYDEN sworn, says: That he remembers the day on which Webb was killed; saw prisoner on that day some twenty-five or thirty minutes before the homicide, at Thompson's Hotel; spoke and talked with prisoner some two or three minutes; saw he was somewhat in liquor, but not to be considered drunk; Ennis kept the bar; considered prisoner perfectly sane; saw nothing unusual, except that he had been drinking too much; left prisoner in the bar-room; prisoner was standing talking with some gentlemen at the bar.

*Cross-examined:* Did not see him drink; judged from his manner and appearance that he had been drinking; had seen him frequently in that condition before; his conduct was not that of a sober man; witness just passed the usual compliments with prisoner.

S. B. LOVE recalled by State, says: That he saw prisoner on the morning of the killing, some twenty minutes before; prisoner and Stegall were walking from the Trout House towards Atlanta Hotel; prisoner was walking locked arms with Stegall; thought, from his appearance, that he had been drinking; did not seem to steady himself in turning as a sober man would; turned his head and looked around towards witness.

*Cross-examined:* The reason why witness looked in to see prisoner was, because somebody said he was asleep, and he turned and looked at him.

with an order that the rule operate as a supersedeas, **will not authenticate the matters of fact alleged in the motion. The facts,** to be accepted as true in the supreme court, over objection made at the proper time, **must,** if the new trial has been refused in the court below, **be certified as true in the bill of exceptions,** or their truth must clearly appear in the record by some other direct statement of the judge."

THOMAS GANNON sworn, says: That he heard a conversation between prisoner and Webb at the Trout House bar-room, on the night before the killing. Choice, and Webb, and Glenn were standing together about half-past 11 o'clock; Col. Glenn walked out; at the same time Webb came up to Choice and touched him on the thigh; both walked out together from the bar-room. Next he saw, Choice came back into the bar-room, and said to witness, "What do you suppose that damned bailiff done?" Witness said he did not know; prisoner said he (the bailiff) had arrested him for ten dollars, and would not take his word for the amount; witness said if he had known it, he would have paid the ten dollars himself, as prisoner was going that night to New York; prisoner told witness that Ennis had told Dr. Dowsing that he would pay the ten dollars and allow it to Dowsing on account, and that Dowsing refused to do it; Mr. Choice asked witness if he had a knife, and witness answered, no; then he asked witness if he had a pistol, and he answered, no; then he went to Spalding and asked him for a knife; then turned back and said he would cut out the bailiff's, or Dr. Dowsing's, heart, being then very much excited. After a few words of remonstrance and advice from witness, prisoner went out, witness did not know where; got a knife from Spalding; saw him afterwards coming back to the same place; witness and prisoner had a drink together.

*Cross-examined:* Witness' opinion was, that on the morning of the killing, prisoner was out of his mind; it is his opinion now, that, when drinking, prisoner was out of his mind.

JOHN ENNIS sworn, says: That he saw prisoner on the morning of the killing, between 9 and 10 o'clock; came into the bar-room and asked witness to make him a drink, and asked witness to take a drink with him, which he did; prisoner said to witness, you were not here last night; witness said, no; prisoner said he had been used damned mean by a rascal, or used mean by a damned rascal, the night before; asked witness if he had heard how he had been used; witness replied that he had heard prisoner had been arrested the night before; told prisoner that he had heard that he had abused the bailiff, and said that he ought not to have done that; that bailiff was a sworn officer and doing his duty, and not to blame; that if any blame was to be attached, it was

Thompson *v.* Georgia Railroad and Banking Company, 55 Ga. 458 (1, 2), 461, and cases there cited.

OPINION AS EVIDENCE OF INSANITY. "The jury is not bound to take the opinion even when the facts are given, but it is proper for the jury themselves to consider such facts to ascertain whether the conclusion of the witness is justified by such facts. In the case of Choice *v.* State, 31 Ga. 422, speaking of opinions, as to the fact of in-

the plaintiff in the bail writ; told him he owed an apology to Webb. Prisoner seemed to reflect a moment or two, and said: "I believe I do," and I will apologize to him when I see him.". Asked him if he had been to breakfast; prisoner said no; witness advised him to go and get breakfast; said he would go and get oysters for his breakfast; that it was too late for breakfast. That was the last conversation witness had with him; prisoner seemed like a man who had been drinking the night before, and had been sleeping.

JOHN McGEE sworn, says: That John Gannon was keeping the Trout House bar at the time of the killing; witness had charge of the bar; saw prisoner take a good many drinks the night before; in fact, he was intoxicated—can't tell how many drinks he took. Prisoner remained in the bar-room until about 12 o'clock; prisoner was about middling intoxicated; saw deceased come in, tap prisoner, went out a while, and came in again; did not hear any threat; saw Mr. Choice next morning in bar-room between 9 and 10 o'clock; prisoner drank twice or three times that morning previous to the shooting.

*Cross-examined:* Has known Choice one or two years; has known him, in one of his insane ways, to present a pistol at a friend; has presented it at witness; saw him on the day after killing; looked at him particularly; he looked wild and excited; made an effort to go down the bar-room steps; the officers carried him along; he looked wild and excited, his eyes rolling around. On the occasion of prisoner presenting a pistol at witness, prisoner came down next morning and apologized like a gentleman; said he did not know that he had done it until some of his friends told him of it; thinks prisoner is insane when he takes too much drink; thinks he was insane on the day of the shooting, or he would not have done so; witness thought at the time he tried to shoot him he was insane; witness concluded before the difficulty that prisoner was insane when drinking; at the time of presenting pistol at witness, prisoner was drinking.

E. T. HUNNICUTT, marshal, sworn, says: Witness and Mr. Branan carried Choice to calaboose after killing; as they were going on past the Trout House, prisoner asked witness where the nearest prison was; witness said the calaboose was the nearest; prisoner said put him in, and not let them hurt him; heard voices all around him crying out, "Hang

sanity, Judge Lumpkin says: "It has been the settled doctrine of this court from its organization, that the opinion of witnesses other than experts are admissible as to matters of opinion, especially as respects sanity or insanity, provided such opinions are accompanied by the facts upon which they are founded," referring to 6 Ga. 324; 14 Ga. 242; 20 Ga. 480." Graham *v.* State, 102 Ga. 653-4.

**OPINION OF JUROR FORMED AND EXPRESSED FROM HEAR-**

him!" "God damn him, hang him!" It was after the cries had been made that prisoner remarked to witness as to where is the nearest prison; to put him in it, and not let them hurt him; witness told prisoner they should not hurt him while he had charge of him; witness pulled up then pretty fast. This is all prisoner said at that time; this took place about 11 o'clock, A. M.

*Cross-examined:* No questions.

D. H. BRANAN sworn, says: As we were coming from Milledgeville last April, prisoner, Jones and Cobb were all together; as we were coming near Williams' Station, witness went and set down by Mr. Choice; witness said to prisoner, the circumstances were different from the time that they rode together on the train before; prisoner said yes; witness told prisoner that he did not think, when they went on to Milledgeville together, when witness carried old man Terry down there, that they would come back that way; prisoner then asked witness something about old man Terry; was talking about him; prisoner said old man Terry was sorter funny; old man Terry had some little books along. Witness said something about old man Terry writing poetry; witness said to prisoner (called him Bill), it came very near being me that had to serve them papers on you; told prisoner the reason he did not do it; thinks prisoner said, I wish it had been you, it might have been different; that Mr. Webb did not treat him exactly right, he didn't think. Witness thinks he told prisoner he always tried to treat every one right; that he had had no difficulty as yet, or something that led to that. Prisoner told witness how it happened, or something; when deceased came to him, he told him Dr. Dowsing was owing John Ennis, and that Mr. Ennis would give Dr. Dowsing credit for the amount; Mr. Webb refused to settle it in that way, and he thought he ought to have done it, as Dowsing was owing John Ennis; said that he was drinking, and Mr. Webb knew that he was, and ought not to have treated him so. Witness said he had heard something of him (prisoner) going to leave on night before difficulty; that he had made an arrangement with some New York house. Prisoner said he was not going to leave, and told Mr. Webb so; prisoner said that he and Webb went to see Ennis to get him (Ennis) to credit what he (prisoner) owed Dowsing on what Dowsing owed Ennis; prisoner said nothing about what occurred in the bar-room of Mr. Ennis.

**SAY NO DISQUALIFICATION.** "It is alleged that in impannelling a jury, one of the jurors said he had formed and expressed an opinion from hearsay, but could give the prisoner a fair trial. **The Court refused to exclude him** for cause, and the prisoner challenged peremptorily. The jury was obtained before the prisoner exhausted his challenges.

THOMAS U. WILKES sworn, says: The killing of Webb, he thinks, took place on Friday, the 30th of December. On the next morning (Saturday), witness received a request to visit Mr. Choice in the calaboose; witness went to the calaboose about 10 o'clock, A. M., and found a crowd assembled, and a good deal of excitement. It was thought advisable not to go in then; there was a meeting at the City Hall, and it was thought advisable not to go in until the result of that meeting was known. Witness supposes it was between 12 and 1 o'clock when he got in; found Mr. Choice under a very deep state of feeling, and he told witness the object of his request, and commenced and gave witness an account of the steps he had taken, which led to the crime for which he was then imprisoned; prisoner alluded to his mother with a good deal of emotion—a very excellent and pious mother; spoke of her counsels to him, and if he had heeded those counsels, he would not at that time be imprisoned for the crime he was; but stated he had torn himself away from his mother and her counsels and influences, and thrusted himself upon other and vicious society; by which he was led to the grogshops, to the billiard table or saloon; not certain which he used—where he was, he was brought under the influence of vicious society, by which he was led into the habit of drinking, and that to drink he ascribes the act for which he was then imprisoned; stating at the same time that when he (prisoner) was under the influence of liquor, he was either like a mad man or a fool, don't recollect which; he stated that he had nothing against deceased to justify the deed, and that he would not have killed him for the world, if in his proper mind. He then requested me (as I was to preach the funeral of Mr. Webb on the next day; he conceived the idea that I was to preach the funeral of Webb, from the conversation, or some other way) to allude to the steps which he had taken, and led to his ruin, and warn all young men of adopting a similar course from him and his sad example. Further, he requested that I should warn all young men of adopting a similar course; adding, that he regarded no young man as safe whose associations were vicious; Mr. Choice stated that such associations would lead young men to drink, and he thought there was no security when the young man took to his cups; stated, also, that his prospects in life had been flattering. Witness thinks his turn was as good as any

This refusal of the Court is alleged as error. That it is not error, see the following authorities: Mitchum v. The State, 11 Georgia, 636; Anderson v. State, 14 Georgia, 710; Griffin v. State, 15 Georgia, 476; Jim v. State, Ibid, 534; Mercer v. State, 17 Georgia, 146; Wright v. State, 18 Georgia, 383; Costly v. State, 19 Georgia, 614; Thompson v. State, 24 Georgia, 297. The Court is the trior, and no error lies to his finding:

Choice vs. The State of Georgia.

young man in the country; but by drink, his prospects were. then all cut off, and that he was a ruined man, and that he: then had but one object before him at all, and that was to endeavor, if such a thing might be, in such a case, to seek the pardon of his sins, and a preparation to meet his Maker. Mr. Choice attributed the act exclusively to drink.

*Cross-examined:* Says that he does not know that he used the term "exclusively;" he gave no other cause.

SAMUEL WALLACE sworn, says: On the day of the killing, witness was coming down Decatur street, in front of Thompson's Hotel; in a bar-room door this way saw Mr. Choice and some other gentlemen; that is, the man they called Choice; witness had a hickory in his hand, with a rope tied to the end of it about two feet long; he took it out of my hand and asked what I used it for; witness told him he drove his horses or oxen with it; he laughed and handed it back; witness stepped off the walk, and Mr. Webb and Mr. Cason, witness thinks is the gentleman's name, were standing together on the plank walk to the car-shed. This man, Choice, as they call him, fired a pistol, and witness thought, as it was the last day of the year, it was some sport between the two men. Webb stepped off the walk, and, said he, "Don't shoot." This man, Mr. Choice, raised his hand, and said, "God damn you, I will kill you anyhow." The pistol fired, and Mr. Webb staggered and fell, and Choice started to walk off, and said, "You will take that?" or "damn you, take that," don't know which, and walked under the shelter of the Trout House, and beckoned from where he came two or three times with his finger; he then went out of witness' sight. When witness first saw Choice, he took him to be drinking— had that appearance. It was but a short time between the time Webb and Choice was talking, until the firing of the pistol.

*Cross-examined:* Says he is the witness who testified in a case of Carlisle *vs.* Flowers by interrogatories; don't know which took his interrogatories; just passed Mr. Choice on the day of the killing.

State closed here again.

Galloway *v.* State, 25 Georgia, 596.   See 22 Georgia Reports, 556."   Westmoreland *v.* State, 45 Ga. 279.

OPINION OF WITNESS THAT ACCUSED SEEMED TO BE EXCITED. "The testimony of a witness that, on a given occasion, a particular person appeared to be excited, or did not so appear, is not subject to objection upon the ground that it is a mere opinion or conclusion of the witness, and therefore inadmissible." Roberts *v.* State, 123 Ga. 146 (6), 161.   And see Leary *v.* Leary, 18 Ga. 696; Traveler's Insurance Company *v.* Sheppard, 85 Ga. 752 (8).

PRESUMPTION OF MALICE. "When a homicide is proved, the law presumes malice, and unless the evidence should relieve the slayer, he should be found guilty of murder." Clarke *v.* State, 35 Ga. 75 (2), 80. And see Cohron *v.* State, 20 Ga. 760.

### Evidence for Defence in Rebuttal.

H. W. BROWN reintroduced, says: That the evidence he has heard has not changed his mind from the impression he first gave.

*Cross-examined:* Has heard McGee's, Wallace's, Glenn's, Wilkes', and a good part of Mr. Ennis' evidence, but not the balance of the evidence on the part of the State; does not pretend to say what was the cause of the insanity; says that the state of mind might be caused by alcoholic stimulants. Witness testifies that he regards these paroxysms as temporary that he has been testifying to.

WILLIS F. WESTMORELAND reintroduced, says: He has heard McGee's, Mr. Branan's, a portion of Mr. Ennis', and a portion of Mr. Wilkes', and a portion of Mr. Hunnicutt's; the evidence he has heard has no effect in changing his opinion.

*Cross-examined:* Did not hear Judge Hayden's; did not hear all of Wilkes'; did not hear Glenn's last night; did not hear all of Mr. Love's nor Mr. Gannon's testimony given in. Did not hear any of Hayden's or Gannon's; his opinion is, that the subject might have been insane; does not pretend to say what was the cause; liquor will cause the state of mind described by the witnesses. Heard Branan's testimony; heard Wilkes'; heard McGee's; heard Wallace's; did not hear Ennis' distinctly; was in the room when Hunnicutt testified; heard a portion of his testimony; does not recollect any of Gannon's; did not hear any of Mr. Ennis'.

The defendant here closed his testimony, and the presiding Judge charged the jury as follows, to wit:

## JUDGE BULL'S CHARGE TO THE JURY.

GENTLEMEN OF THE JURY: You have been impanneled to try a most important issue, and during the progress of this trial you have often been reminded of its momentous importance; and it is true that it is one of the most important issues that can be committed to a jury; it is one of vital importance to the accused, because with him it is a question of life and death; it is one of no less importance to the public, by its laws, to protect its citizens in the enjoyment of their lives, their liberties, their reputation, and their property; it is in return for this protection that the citizen owes obedi-

---

"The first discussion of the subject by this court appears in the report of the case of Hudgins v. State, 2 Ga. 188. In commenting on the sufficiency of the evidence to support a verdict of murder, Lumpkin, J., said: 'The law presumes every homicide to be felonious, until the contrary appears, from circumstances of alleviation, of excuse, or justification; and it is incumbent on the prisoner to make out such circumstances to the satisfaction of the jury, unless they arise out of the

ence to the Government. The reason that you cheerfully pay your taxes and render your personal services to the Government as jurors, or as soldiers, is, that the Government spreads the ægis of its protecting laws over you and your families, even in defenceless slumbers. And this protection can only be afforded by an impartial and rigid enforcement and vindication of the laws.

The prisoner at the Bar, William A. Choice, is indicted for the murder of Calvin Webb, committed, as alleged, on the 30th day of December, 1858; and on the State devolves the burden of establishing this charge by proof.

Every criminal trial is commenced with the presumption that the accused is innocent, and this presumption continues until rebutted by such proof as convinces the mind of his guilt beyond a reasonable doubt.

The first inquiry that naturally arises in the solution of this question of guilt or innocence to be determined in this case is, Has a *homicide* been committed? Has it been shown that Calvin Webb has lost his life by the hand of violence? and, if so, was that act committed by the prisoner at the Bar? If these facts are found to be true, the next inquiry is, What is the character of that homicide? For there are several grades of homicide recognized by the law, involving different degrees of punishment; such as murder, voluntary and involuntary manslaughter, and justifiable homicide. The defendant in this case is indicted for murder, and, in the opinion of the Court, there can be no intermediate verdict between that of guilty of murder and that of not guilty; and it is therefore unnecessary to charge you on the minor grades of homicide. Murder is the unlawful killing of a human being in the peace of the State by a person of sound memory and discretion, with malice aforethought, either expressed or implied. Expressed malice is that deliberate intention to take away the life of another, which is manifested by external signs capable of proof; such as a previous quarrel, threats, some expressed grudge, and the like. And when no considerable provocation appears, and all the circumstances of the killing show an abandoned heart, the law implies malice. When the homicide is proven to have taken place by unauthorized violence, the law presumes that it was committed with malice aforethought, unless the accompanying proof shows that it was done without malice. So that it is suffi-

evidence produced against him.' No question was raised as to what would be an appropriate charge under the facts of that case, and the discussion was limited to the point before the court, viz.: the quantum of evidence necessary to support a conviction of murder. The point was up in like manner in the following cases: Roberts *v.* State, 3 Ga. 325· Choice *v.* State, 31 Ga. 424, 464; Bird *v.* State, 14 Ga. 54; Wortham *v.* State, 70 Ga. 336; Cohron *v.* State, 20 Ga. 752. In Clarke *v.* State, 35

cient for the State, in order to make a *prima facie* case of murder, simply to prove the killing, and then the burden of proof is thrown on the defendant to absolve himself of the guilt of murder.

The defense set up in this case is, that the defendant, if he committed this act, was not, at the time, of sound memory and discretion; that, by deprivation of reason, he was not legally responsible for his acts at the time the deed was committed.

It is true, that according to all recognized principles of law, Divine and human, an individual bereft of reason, either by the act of Providence, by accident, or by his own act, with one exception, is not responsible, legally, for his acts committed while in that condition.

This is the general principle, subject to such qualifications as I will presently mention.

According to the language of our Penal Code, a man must be of sound memory and discretion; and the next inquiry is, to determine what is the legal meaning of that phrase; for it is not every grade of insanity that will excuse the committing of crime, and render an individual irresponsible for his acts.

Mental unsoundness has been divided into various classifications by the learned medical authorities; but I will not confuse you or myself by attempting to notice all these learned distinctions. The simple rule laid down by the law is this: That if a man has capacity and reason sufficient to enable him to distinguish between right and wrong, as to the particular act in question; if he has knowledge and consciousness that the act he is doing is wrong, and will deserve punishment, he is, in the eye of the law, of sound mind and memory. Our Penal Code defines a sound mind in nearly similar terms.

It lays down the rule: "A person shall be considered of sound mind who is not an idiot, a lunatic, or affected by insanity; or who hath arrived at the age of fourteen years, or before that age, if such person know the distinction between good and evil."

But though it is the general rule that insanity is ordinarily an excuse, yet there is an exception to this rule, and that is, when the crime is committed by a party in a fit of intoxication, though the party may be as effectually bereft of his

Ga. 80, the court held that **an instruction that 'when a homicide is proved, the presumption is that the killing is murder,** and that it was for the evidence to show justification or to reduce the offense to a lower grade,' was **unobjectionable.** A similar instruction was upheld in the following cases: Dozier *v.* State, 26 Ga. 157; Hill *v.* State, 41 Ga. 504; Wilson *v.* State, 69 Ga. 241; Bell *v.* State, 69 Ga. 752; Marshall *v.* State, 74 Ga. 26; Vann *v.* State, 83 Ga. 44; Lewis *v.* State,

reason by drunkenness as by insanity produced by any other cause. A voluntary contracted madness is no excuse for crime. The law does not permit a man to avail himself of his own gross vice and misconduct, to shelter himself from the legal consequences of such a crime. The broad rule is, that drunkenness is the exception to the general rule; but the crime to be within this exception, and therefore punishable, must take place, and be the immediate result of the fit of intoxication, and while it lasts and the mere consequence of insanity, remotely occasioned by previous habits of excessive indulgence in liquor. The law looks to the immediate, and not to the remote cause which produced it. To illustrate this idea: If, by a long practice of intoxication, an *habitual* or *fixed* insanity is caused, or a permanent injury to the mind produced—although this madness was at first contracted voluntarily, yet the party is in the same situation in regard to responsibility for crime, as in a state of insanity caused by nature or accident.

But if the ordinary condition of a man's mind, when free from the excitement of liquor, is regular, capable of understanding the moral quality of his acts, of speaking, reasoning and acting coherently, and he voluntarily deprives himself of reason by intoxication, and commits an act while in that condition, he is responsible.

Nor does it make any difference that a man, either by former injury to the head or brain, or constitutional infirmity, is more liable to be maddened by liquor than another man. If he has legal memory and discretion when sober, and voluntarily deprives himself of reason, he is responsible for his acts in that condition. But if a man is insane when sober, the fact that he increased the insanity by the superadded excitement of liquor makes no difference. An insane man is irresponsible, whether drunk or sober.

The rule laid down by our Penal Code, is: "That drunkenness shall not be an excuse for any crime or misdemeanor, unless such drunkenness was occasioned by the fraud, artifice, or contrivance of another."

So that the deduction from all their rules is, that if the insanity was the immediate consequence of drunkenness, it is no excuse in law, though the former injury may have rendered him more liable to be crazed by liquor than if he had never received it; for a man in such a condition, if sane

90 Ga. 95; Butler *v.* State, 92 Ga. 601; Dorsey *v.* State, 110 Ga. 333; Tuggle *v.* State, 119 Ga. 969; Williford *v.* State, 121 Ga. 173; Anderson *v.* State, 122 Ga. 175." Mann *v.* State, 124 Ga. 762.

**REBUTTAL EVIDENCE.** "In John *v.* The State, 16 Ga. 200 (4), **the only answer made by the defendant to the evidence of the main witness against him, was an attack upon his general character for truth and veracity. In answer** to this attack it was held that **the State might**

while sober, has no right to indulge a morbid appetite, at the expense of risk to the lives of others. And to lay down any other principle, would produce consequences to society which the imagination can better conceive than words describe.

These are the rules for determining the question of insanity, and the degree and nature of insensibility to the law.

There is another principle connected with the subject, and that is, that the law presumes every man of sound mind until the contrary appears; and the burden of proof is always on the defendant, to show that at the time of the commission of the act, he was not of sound mind. And it ought to be made to appear to a reasonable certainty—to your reasonable satisfaction, that at the time of the commission of the act the party did not know the nature and quality of the act, or if he did, did not know that the act was wrong.

And it now devolves on you to decide whether the defendant has, by proof, rebutted this legal presumption of sanity. And this, like the other injury, is to be determined by the testimony.

Evidence on the question of mental soundness, or unsoundness consists of facts and circumstances tending to prove the one or the other, and of the opinion of witnesses in connection with the facts detailed by them, and the opinion of experts founded on the facts proven.

The opinion of witnesses unskilled on such subjects is entitled to no weight disconnected with the facts, and though great respect is due the opinions of gentlemen of the faculty, skilled in such matters by reason of their superior skill and advantage for understanding the operations and the phenomena of the human mind, yet it is at last from the facts proven that a jury are mainly to decide. They are not bound by any opinion, unless that opinion is sustained by the facts proven.

These are the principles of law governing this case, and it is exclusively your province to apply them to the facts of this case, and to render a true verdict according to the evidence, and according to nothing else.

If, after mature deliberation, you are satisfied beyond a doubt that the prisoner is guilty, you will find him so. If not, you will find him not guilty.

It is to be regretted that any allusion should ever be made before a jury in charge of such a case as this, to outside in-

adduce more evidence to the principal facts, those to which the attacked witness had testified on his examination in chief. In Rust v. Shackleford, 47 Ga. 538, the plaintiff testified to a sale of the cotton in question; the defendant testified the sale was conditional. It was proposed to prove by the plaintiff in rebuttal that the sale was not conditional, but absolute; and it was held erroneous not to allow this to be done. In Bryan v. Walton, 20 Ga. 510 (7), it is said, 'Plaintiff had made out

fluences—to the state of public opinion, or any other circumstances by which it would be improper that a jury should be influenced.

If, upon deliberation, there is a reasonable doubt left on your mind of the guilt of the accused, the humanity of the law gives to the accused the benefit of that doubt, and makes it the duty of the jury to acquit.

By a reasonable doubt, is meant such a doubt as now arises from the testimony, in the mind of a reasonable man, and leaves it hesitating, unsettled, and undecided.

Absolute certainty is not to be attained by any mode of judicial investigation. A moral or reasonable certainty is all that the law requires, and all that is attainable.

And now, gentlemen, this case is fully committed into your hands as judges of the law and of the facts. I do not permit myself to suppose that you will be influenced by anything outside of the testimony of the case, or to doubt that you will discharge your duty fearlessly, independently and impartially.

The jury, after deliberating about two hours, returned a verdict of guilty.

Counsel for the defendant then made a motion for a new trial of said case, on the following grounds, to wit:

First: Because the Court erred in refusing to allow the witness (Daniel S. Printup) to state in evidence the following facts: "That a short time after the homicide was committed, he visited prisoner, and, for the purpose of testing his sanity, informed prisoner, amongst other things, that it might be very important in his defence to know from whom he procured the pistol with which he shot deceased, for the two-fold purpose of proving by the person from whom he procured it, his condition of mind at the time, and also to show that the pistol was not the property of prisoner, and that it could not be ascertained from any other person, from whom it was procured; and that he (witness) said nothing to the prisoner but what would render it to his interest to disclose the fact, if he knew it; to all of which prisoner replied, that he had no recollection whatever of having a pistol, nor of any person from whom he did or could procure it, and had no recollection of shooting, or even seeing deceased." And also in refusing to allow said witness to state the means adopted by B. H. Hill to test the sanity of prisoner at the time of commit-

---

a prima facie case; it had been assailed vigorously by the defendant, and the purpose of this proof was to fortify his title thus attacked. It was, we apprehend, competent to do so. It is a matter of every-day practice in the courts.' And see Walker v. Walker, 14 Ga. 242 (5); Bird v. The State, Id. 48; Choice v. The State, 31 Ga. 424 (2). A new trial results from the improper exclusion of any material evidence (in a case

ting the act, before he was employed to defend prisoner. (And in refusing to allow the counsel to state before the Court what facts he did propose to prove on this subject.)

The presiding Judge certifies, relative to this ground: "That the counsel only proposed to prove a conversation with the prisoner by himself some three months after the homicide."

Second: Because the Court erred in refusing to allow prisoner to prove, that owing to the diseased condition of his mind, the family and friends about Rome had long refused to allow prisoner to have deadly weapons.

Relative to this ground, the Judge certifies: "That he has no recollection of any offer to prove any control, or attempt to control, the defendant, in the carrying of weapons, or any refusal to permit him to carry them. The witness did testify that the family had endeavored to prevent his carrying a pistol."

Third: Because the Court erred in allowing the State to prove in rebuttal, by Luther J. Glenn, the difficulty between prisoner and deceased the night before the homicide as evidence of express malice, and to the same point, in allowing the evidence of Thomas Gannon and Samuel Wallace.

Fourth: Because the Court erred in allowing Luther J. Glenn and J. A. Hayden to give their opinions as to the sanity or insanity of the prisoner, and in allowing them to give their statements that prisoner was "drinking," when such statements were given as conclusions, and not as facts.

Relative to this ground, the Judge certifies: "That he heard no objection to the testimony at the time it was given in; and that the opinions of witnesses (other than experts) as to the sanity or insanity of the defendant, was first introduced by the defendant's counsel, and at their instance; and after objection made by counsel for the State, the testimony was admitted by the Court, with the distinct avowal, that as that question was somewhat unsettled, if the defendant's counsel insisted on it, the evidence would be admitted, with the condition that the rule should work alike in favor of both sides, and the defendant's counsel expressly accepted the condition."

Fifth: Because the Court erred in this: When the State had closed its rebuttal testimony, the defendant reintroduced Dr. H. W. Brown and Dr. W. F. Westmoreland, to prove

like the present) on the main question in controversy." Bray v. Latham, 81 Ga. 643.

**REOPENING CASE, DISCRETION OF COURT.** "It is within the discretion of the court to allow the State to reopen its case by the introduction of further testimony after the defendant has closed his case, and this discretion was not abused in the present case." Huff v. State, 104 Ga. 521 (5), 524. And see Eberhart v. State, 47 Ga. 599. "It is always

Choice vs. The State of Georgia.

that the additional facts proven in rebuttal, taken as true, did not change their opinions of the insanity of the prisoner at the time of the killing. Each witness stated that he did not hear some of the witnesses in rebuttal, when the defendant moved that these facts be read to them, which the Court would not allow to be done.

To this ground the presiding judge annexes the following qualification, to wit: "That this motion was made as to Dr. Westmoreland, who stated that he was present while the witnesses were being examined, but did not hear all their testimony; that at the request of defendant's counsel, the Court had permitted portions of the testimony to be read over in the hearing of the medical witnesses as a foundation for their further examination, but refused to allow it any further, stating that counsel might state the facts hypotheically, and ask the witnesses their opinion upon them."

Sixth: Because the judge erred in failing to include in his charge to the jury the law on all material facts proven in the evidence and insisted on by counsel for the defence; and especially in not charging the jury as insisted on by counsel for the defendant before the jury, whether the prisoner was or was not responsible for crime, if, by reason of the injury to his brain or otherwise, he was afflicted with the disease called *oinomania,* and by reason of this disease was irresistibly impelled, by a will not his own, to drink, and after being so impelled, did drink, and thus become insane from drink, and whilst thus insane committed the homicide. And also in not charging the jury as insisted on by counsel, that if they believed the prisoner had suffered by injury or otherwise, a pathological or organic change in his brain, which produced the disease of *oinomania,* and by this disease was irresistibly impelled to drink liquor, and from the liquor thus drank became insane, and while thus insane killed the deceased, he was not guilty of murder.

Seventh: Because the Court erred in charging the jury, that if the prisoner labored under a disease of the brain, which did not render him insane, but, notwithstanding the disease, knew right from wrong when sober, and then drank liquor, which produced madness, or insanity, and killed the deceased, he was guilty of murder.

To this ground the judge annexes the following, to wit: "For this, and all other exceptions to the charge, the charge itself is referred to."

in the discretion of the trial judge, after the evidence has been closed, to allow the case to be reopened for the purpose of introducing further testimony; and **this court will not interfere with that discretion unless it has been abused,** a circumstance which was not made to appear in the present case. This principle is so well settled as to require no fur-

Eighth: Because the Court erred in refusing to charge the jury in language or substance, as requested by defendant's counsel in writing, as follows: "If they believe that the prisoner was insane when he left Rome, and came to Atlanta, and continued insane until he killed deceased, then the fact that he drank liquor in the meantime can not render him liable, but he must he acquitted of murder.

Ninth: Because the Court erred in charging the jury that insanity, produced proximately by drunkenness, is no excuse for crime, and no palliation for crime.

Tenth: Because the Court erred in charging the jury, that insanity was an excuse for crime, unless such insanity was produced by liquor.

Eleventh: Because the Court erred in charging the jury, that they could not find the prisoner guilty of any grade of homicide below murder, and that he was guilty of murder or not guilty at all.

Twelfth: Because the verdict of the jury was contrary to law, and contrary to evidence.

Thirteenth: Because the verdict was strongly and decidedly against the weight of the evidence.

Fourteenth: Because the Court erred in refusing to allow the defendant to prove by Printup and Hooper, and others, the family and neighborhood reputation of the prisoner as being permanently injured in his mind, and the contemplation before the homicide was committed, of confining him as a lunatic.

To this ground the judge annexes the following: "The witness was proceeding to state, that for some time after the injury, fears were expressed by the family, or some of them, that his mind would never entirely recover from the effects of the injury, when counsel for the State objected to the testimony, and it was rejected. I have not the slightest recollection that any offer was made to prove any intention or design to confine the prisoner as a lunatic, or for any other cause."

Fifteenth: Because the Court erred in submitting to the jury the question of drunkenness, as explanatory of the prisoner's condition at the time of the homicide, and that the defendant could not protect himself from the responsibility of one crime, when committed during insanity produced by another crime voluntarily assumed.

ther elaboration here, but we refer in passing to the cases of Bird v. State, 14 Ga. 43; Walker v. Walker, Id. 242 (5); Beale v. Hall, 22 Ga. 432 (4); Choice v. State, 31 Ga. 424 (2); Cothran v. Forsyth, 68 Ga. 560 (2), and White v. State, 100 Ga. 659." Frazier v. State, 112 Ga. 870-1.

Sixteenth: Because the charge of the Court, as a whole, and in each of its parts, was error, in that it submitted to the jury questions not made by the issues and facts, and did not submit to the jury the questions made by the issues and the facts.

To this ground the judge appends the following: "After the charge was concluded, the Court asked whether the counsel on either side wished any further charge, and no response was given by either."

Seventeenth: Because the verdict of the jury was contrary to evidence in this: that it was against all the evidence of the experts and medical witnesses on the question of insanity; and also against the evidence of the opinions of every witness who gave his opinion on the subject of sanity or insanity, and who saw the killing, and who were intimately acquainted with the condition of the prisoner on the day of the homicide.

Upon the hearing of the same, the presiding judge overruled the motion on all the grounds taken in the rule, and refused the new trial, and error is assigned upon that decision, and upon the following charge of the Court, to wit: "Though great respect is due the opinions of the gentlemen of the faculty, skilled in such matters, by reason of their superior skill and advantages for understanding the operations and phenomena of the human mind, yet it is, at last, from the facts proven that a jury are mainly to decide; they are not bound by any opinions, unless the opinions are sustained by the facts proven."

B. H. HILL, A. R. WRIGHT, and CALHOUN & SON, for the plaintiff in error.

THOMAS L. COOPER, Sol-Gen'l., for the defendant in error.

*By the Court.*—LUMPKIN, J., delivering the opinion.

To avoid being tedious, I was strongly inclined to pass in silence all the minor points in this case. They were not dwelt upon by the able counsel in the argument. On account of the importance of the case, however, I concluded that every assignment of error had best be noticed. I shall dispatch them with as much brevity as possible.

When the bill of exceptions was presented to Judge Bull for his signature, he made in his own handwriting, several corrections of the facts as therein stated. To these additions counsel for the plaintiff in error object; and it becomes necessary, therefore, to dispose of this preliminary point before proceeding further.

After verdict, a rule *nisi* was moved for a new trial. The motion was ordered to be entered upon the minutes. Upon hearing the application, it was refused. It is now insisted that the rule *nisi*, by being placed upon the minutes, became a record, importing absolute verity, and that it is not competent for the presiding Judge to alter or modify the statement of the facts as set forth in the rule *nisi*, when he comes to certify subsequently to the bill of exceptions.

Is this position tenable? The rule *nisi* was, upon the hearing, denied; perhaps partly because the statements in it were not true and consistent with what transpired on the trial. At any rate, this is a sufficient reason for refusing such an application. The only effect of placing the motion upon the minutes was, to show that such a motion had been made at that term of the Court, and upon the grounds therein stated. That could not be controverted. But it did not concede that the facts therein stated were true.

1. It is complained that the Court erred in refusing to allow the witness, Daniel S. Printup, to state in evidence the following facts: That a short time after the homicide was committed he visited prisoner, and, for the purpose of testing his sanity, among other things, informed the prisoner that it might be very important in his defence, to know from whom he procured the pistol with which he shot deceased, for the twofold purpose of proving by the person from whom he procured it, his condition of mind at the time; and also, to show that the pistol was not the property of the prisoner; and it could not be ascertained from any other person from whom it was procured; and that he said nothing to the prisoner but what showed that it would be to his interest to disclose the fact, if he knew it: when the prisoner replied, that he had no recollection, whatever, of having a pistol, nor any person from whom he could, or did, procure it; and had no recollection of shooting, or even seeing the deceased.

And also, in refusing to allow said witness to state the means adopted by B. H. Hill to test the sanity of the pris-

oner at the time of committing the act, before he was employed
to defend prisoner, and in refusing to allow the counsel to
state before the Court what facts he did propose to prove on
this subject.

To this first ground of alleged error in the bill of excep-
tions, the judge appends this note: "The counsel only offered
to prove a conversation with the prisoner, by himself, some
three months after the homicide."

Let us look at this ground for a moment, apart from the
qualifying statement added by the judge:

If the prisoner were sane at the interview between Col.
Printup and himself, and he is deserving of the reputation
which he has always sustained, of being a young man of more
than ordinary talents, it would have occurred to a much duller
intellect, in the twinkling of an eye, to have feigned entire
ignorance and forgetfulness of the whole transaction, as much
more available to his defence than any information he could
communicate upon the points, to which his attention was di-
rected.

What tests were applied by Mr. Hill, the powerful and in-
defatigable champion of the accused, we are not informed.
We know that Mr. Hill does not profess to be an expert; and
if he did, we are not aware that the law recognizes any such
mode as the one pursued in this case for testing the sanity of
culprits.    It is not the conduct or declarations of the party,
at the time of the act, which are sought to be proven as a part
of the *res gestœ*, but matters transpiring subsequently.   In the
hands of honorable men—and the character of those con-
cerned in this matter are above suspicion—a precedent like this
might not be so mischievous.   It is a practice, however, so
liable to abuse, that we think it safer to discourage so danger-
ous an innovation.

We were glad that no point was made, in the argument,
upon the refusal of the Court to allow counsel to state before
the Court, and, of course, *in the hearing of the jury,* what facts
he did propose to prove as to the matter we have been
discussing.

2. The second assignment of error is, in the Court's refusing
to allow prisoner to prove that, owing to the diseased condi-
tion of prisoner's mind, the family and friends about Rome
had long refused to allow him to have deadly weapons.

To which the Court adds: "I have no recollection of any

offer to prove any control, or attempt to control, the defendant in carrying weapons, or, any refusal to permit him to carry them. The witness did testify that the family had endeavored to prevent prisoner from carrying a pistol."

As the presiding judge refuses to certify that the facts stated in this ground are true, it is needless to review it. It is a very immaterial matter, at best. For what prudent family would not have dreaded to see deadly weapons in the hands, or about the person, of William A. Choice—one who, while in his cups, as all the proof demonstrates, was so dangerous, both to friend and foe?

3. The third complaint is, in allowing the State to prove, in rebuttal, by Luther J. Glenn, the difficulty between prisoner and deceased, the night before the homicide, as evidence of express malice, and in allowing the evidence of Thomas Gannon and Samuel Wallace to prove the same point.

The State having proved the homicide, closed, as the law would imply malice from the killing. To rebut this presumption, the plea of insanity was interposed, and a large amount of evidence adduced to support it. An insane person is not supposed to act from malice. Does it not weaken the force and effect of the prisoner's defence, to show express malice?

Who would not more readily believe that the prisoner was insane, had he shot a friend or an indifferent person, as he frequently threatened to do, but, as usual, *failed or forebore,* instead of one against whom he manifestly harbored a spirit of revenge for a supposed insult or injury? A drunken man rarely, if ever, shoots or stabs another, unless he cherishes some resentment toward him. It is quite otherwise with the insane. A drunken man reasons from correct data; whereas, the insane draw right conclusions from false data.

In this view of the testimony, it was strictly in rebuttal.

But this question has been repeatedly decided by this Court; that is, that the introduction of testimony, whether cumulative or in rebuttal, or for any other purpose, is entirely within the discretion of the Circuit Courts. We said, in one case, that in no case could we consent to reverse the Circuit Judge, for letting in testimony which was relevant, at any stage of the case. *Bryan vs. Walker,* 20 *Ga. Rep.* 480; *Lumpkin vs. Williams,* 19 *Ga. Rep.* 569; *Walker vs. Walker,* 14 *Ga. Rep.* 242; *Bird vs. The State, Id.* 43.

In this last case, the Court says: "The State relied upon

the facts first proven, as making out a clear case of malice—the malice ingredient being implied, as it clearly was reasonably to be implied, from all the circumstances of the killing. The prisoner then put in evidence, facts which went to some extent in rebutting the presumption of malice. The State then asked leave to strengthen its case, by proving express malice; and it being granted, the prisoner excepted." "I confess," says the learned judge who wrote out the opinion, "my inability to see upon what ground. Surely it is not necessary to discuss this point."

4. The next assignment is, that the Court erred in allowing Luther J. Glenn and J. A. Hayden to give their opinions as to the sanity or insanity of the prisoner; and in allowing them to give their statements, that "the prisoner was drinking," when such statements were made as conclusions, and not as facts.

The judge subjoins a note to this exception, to this effect: "I heard no objection to this testimony at the time it was given. The opinions of witnesses, other than experts, as to the question of the sanity or insanity of the defendant, was first introduced by defendant's counsel, and at their instance; and after objection made by the State's counsel, was admitted by the Court, with the distinct avowal, that as the question was somewhat unsettled, if the defendant's counsel insisted on it, the evidence would be admitted, with the condition, that the rule should work alike in favor of both sides; and the defendant's counsel expressly accepted the condition."

Perhaps it would be better to dismiss this point, without a word of comment. Unless the memory of the judge is greatly at fault, this ground should never have been incorporated in this bill of exceptions. When parties stipulate expressly with each other and with the Court, that a certain course shall be pursued in the management of a cause, that agreement should be considered binding, more especially when the record shows, as it does most abundantly in this case, that the defendant has reaped the full benefit of the rule of evidence thus agreed to. Still, that it may not be said that any injustice has happened or fallen to the accused for want of recollection in the presiding judge, I propose to examine this fourth ground to some extent.

It has been the settled doctrine of this Court, from its organization, that the opinions of witnesses, other than experts,

are admissible as to matters of opinion, especially as it respects sanity or insanity, provided such opinions be accompanied by the facts upon which they were founded. *Potts and others vs. House,* 6 Ga. Rep. 324; *Walker vs. Walker,* 14 Ga. Rep. 242; *Bryan vs. Walton,* 20 Ga. Rep. 480; *Goodwyn vs. Goodwyn, Id.* 600. Our books are full of precedents upon this point.

As for myself, I would rely as implicitly upon the opinion of practical men, who form their belief from their observation of the appearance, conduct and conversation of a person, as I would upon the opinions of physicians, who testify from facts proven by others, or the opinions even of the keepers of insane hospitals.

But the question in all such cases is, not which is the most reliable evidence, but the inquiry is, Shall the witnesses be restricted, in their testimony, to a simple statement of facts coming within their knowledge, leaving the jury to draw an inference of sanity or insanity, or may the judgment of the witnesses, founded on opportunities of personal observation, be also laid before the jury, to assist them in forming a correct conclusion? One who has seen and conversed with an insane person, and observed his countenance and behavior, has an impression made upon his mind which is incommunicable. This Court is committed to the rule, that the jury, in such case, is entitled to the benefit of this *impression.*

It may be said that Col. Glenn's opportunity of observing and judging of the capacity of Choice was too limited. But it has been truly remarked, that so different are the powers and habits of observation in different persons, that no general rule can be laid down as to what shall be deemed a sufficient opportunity of observation, other than, in fact, it has enabled the observer to form a belief or judgment thereon.

Col. Glenn had known prisoner for several years, though not intimately; had met him within the last three days before his arrest by Webb; learned from him that he was about going to New York, having engaged to travel for a house in that city; always considered him sane, and a man of more than ordinary intelligence.

Before dismissing, finally, this fourth exception, upon which I am fully conscious of having occupied too much time already, I would suggest, that it does not fairly represent the testimony of Glenn and Hayden. Their testimony, when

taken altogether, is wholly unexceptionable.   Glenn, for instance, says "prisoner, *from his appearance,* had been drinking;" and Hayden, upon his cross-examination, swore, that, "although he did not see Choice drinking, yet he judged, *from his manner and appearance,* that he had been drinking; had seen him frequently in that condition before."

By reading the testimony, it will be seen that expressions similar to that excepted to, abounds on every page of it.   The witness, Gregory, says: "Saw prisoner a short time before he left Rome for Atlanta; had been drinking several days; does not know that he was drinking; *was acting like a man who had been drinking."*   Again, by the same: "thought, at the time he left Rome, the exciting cause of prisoner's insanity was liquor."   Echols testified: "Prisoner appeared to be drinking; witness supposed him to be drunk." ·  Bartlett, sworn: "Did seem like a drunken man."

After such expressions as these, selected almost at random from the answers of the prisoner's witnesses, it would seem rather captious to object to the statements of Glenn and Hayden, that prisoner "appeared to be drinking."   Such expressions, both in ordinary life and in the Courts, convey to the mind, with sufficient certainty, the condition of a person, so as to enable one to pronounce a decision thereon, with reasonable assurance of its truth.   Really, no other rule is practicable.   If the witness must be confined to a simple narration of facts, how the person leered or grinned, how he winked his eyes or squinted, how he wagged his head, etc., all of which drunken men do, you shut out, not only the ordinary, but the best mode of obtaining truth.

We reiterate, then, what we have said from the first—that, legally and philosophically considered, there is no merit in this objection.   And in the case before us, what benefit would it be to the cause of the accused to exclude this truth?   Did not Choice himself state to D. H. Branan, when sober and sane, that he "was drinking that night; that Webb knew that he was, and ought not to have treated him so " Why, I ask should Mr. Webb know it, any more than Glenn and Hayden, except from his conduct and appearance?   But all the proof shows that such was his condition, the night before the homicide was committed.

5. In the next place, it is complained, that when the State had closed its rebutting testimony, the defendant re-intro-

duced Dr. H. W. Brown and Dr. W. F. Westmoreland, to prove that the additional facts, proven in the rebutting testimony, did not change their opinions of the insanity of the prisoner at the time of the killing. Each witness stated that he did hear some of the witnesses in rebuttal; when the defendant moved that these facts be read to them from the evidence as taken down, which the Court would not allow to be done.

To this assignment of error the Court adds: "This motion was made as to Dr. Westmoreland, who stated that he was present while the witnesses were being examined, but did not hear all their testimony. I had, at the request of defendant's counsel, permitted portions of the testimony to be read over in the hearing of the medical witnesses, as a foundation for their further examination; and refused to allow it any further, stating that counsel might state the facts hypothetically, and ask the witnesses' opinion on them."

We understand the law to be this: Medical men are permitted to give their opinion as to the sane or insane state of a person's mind, not on their own observations only, but on the case itself, as proved by other witnesses on the trial. And while it is improper to ask an expert what is his opinion upon the case on trial, he may be asked his opinion upon a similar case hypothetically stated. And this the Court expressly offered to permit the defendant's counsel to do. What more could be asked? The judge was not bound to read, or suffer to be read, the testimony as taken down. He had already allowed this indulgence, at the request of the counsel; still, it was a matter of favor, and not of right.

I shall, for the present, pretermit the sixth, seventh, eighth, ninth and tenth grounds of error, and consider them together hereafter, in connection with the fifteenth and sixteenth assignments.

6. The next error which I shall discuss, is the eleventh ground in the motion for a new trial: because the Court charged the jury, that they should not find the prisoner guilty of any grade of homicide below murder, and that he was guilty of murder, or not guilty at all.

This ground is not correctly stated, in the motion for a new trial, but differs in a material point from the charge as given to the jury; and this discrepancy illustrates the propriety of the view expressed in the beginning of this opinion upon the

preliminary question. Judge Bull would have been justified in refusing the motion for a new trial upon this ground, because it does not state correctly his charge given. Instead of saying to the jury, by way of *direction,* that they should not find the prisoner guilty of any grade of homicide below murder, and *that he was guilty of murder, or not guilty at all,* the charge was this: "There are several grades of homicide recognized by the law, involving different degrees of punishment: such as murder, voluntary and involuntary manslaughter, and justifiable homicide. The defendant in this case is indicted for murder, *and, in the opinion of the Court,* there can be no intermediate verdict between that of guilty of murder, and that of not guilty; and it is, therefore, unnecessary to charge you on the minor grades of homicide."

In the one case, his charge is in the form of *direction;* in the other, it is the *expression of an opinion* merely, and, for that reason, declining to instruct the jury as to the minor grades of homicide, but at the same time, leaving the jury untrammelled by his judicial fiat.

And we concur fully in opinion with the presiding judge, that the killing was murder, or excusable on account of the insanity of the accused. If Wm. A. Choice was sufficiently rational to be criminally responsible for his acts, the killing of Calvin Webb was, in the eye of the law, *murder,* without provocation, and without one mitigating circumstance: if insane, he was entitled to a verdict of acquittal; and there can be no intermediate ground. And for the Court to have charged the jury as to manslaughter, would have been foreign from the case made by the pleadings and the proof. No such defence was set up for the accused; no such request was made of the Court. In *Boyd against the State,* 17 *Ga. Rep.* 194, this Court held, that it was not error to refuse or omit to give in charge to the jury, portions of the Penal Code which have no application to the issue submitted upon the pleadings and proof. And the Court, in that case, say: "We ask what had the law of manslaughter to do with this case?" What a mockery and farce, for the presiding judge to have instructed the jury as to involuntary manslaughter! and yet, he is charged with "manifest error," in omitting to add this! He would have been guilty of manifest folly, if he had. Had there been any evidence, in the case before us, upon which the jury might have mitigated the offense from

murder to a lower grade of homicide, it would have been different. There was not a scintilla of proof to that effect. Without the shadow of excuse, Choice, with deliberate aim, shoots down an unoffending citizen, in the peace of the State. If the law is administered, his life must atone for it, if he be subject to punishment; if he be not, it is fit and proper that he go free altogether, as would the infant and the idiot.

7. It is alleged as error in the Court, that it refused to allow the defendant to prove by Printup, Hooper and others the family and neighborhood reputation of prisoner as injured permanently in his mind, by reason of the injury he had received. No authority is produced to justify the proof of a particular fact by general reputation—a fact, too, in which the public were not concerned. We know of no rule which would allow the introduction of this kind of hearsay testimony. In *Wright against Tatham*, 1 *Ad. and Al.* 3, 8, the question was much discussed, whether letters addressed to a person whose sanity was in issue, were admissible to prove that he was *treated as insane* by the writers of the letters; and after undergoing several investigations before the Court of Kings Bench and Exchequer Chamber, it was finally decided by a large majority of the House of Lords, that such letters were inadmissible, unless connected by proof with some act of the person implicated, in regard to the letters themselves, or their contents.

8. The sixth error alleged in the motion for a new trial is, because the judge failed to include in his charge to the jury, the law on all material facts proven in the evidence, and insisted on in the argument of counsel; and especially in failing to charge the jury whether the prisoner was or was not responsible for crime, if by reason of the injury to his brain, *or otherwise* (mark that expression)! he was afflicted with the disease called *oinomania*, and by reason of this disease, was irresistibly impelled, *by a will not his own*, to drink; and after being so impelled, did drink, and thus became insane from drink, and while thus insane, he committed homicide. The Court also erred in not charging the jury, that if they believed the prisoner had suffered by injury, *or otherwise*, (mark that again)! a pathological or organic change in the brain, which produced the disease of *oinomania*, and by this disease was *irresistibly impelled* to drink liquor, and from the liquor thus drank became insane, and while thus insane, killed deceased, he was not guilty of murder. And

Seventhly, Because the Court erred in charging the jury, that if prisoner labored under a disease of the brain, which did not render him insane, but notwithstanding the disease, knew right from wrong when sober, and then drank liquor, which produced madness or insanity, and killed deceased, he was not guilty of murder.

Eighthly, Because the Court erred in refusing to charge the jury, in language or substance, as requested by defendant's counsel, in writing, as follows: "If the jury believe that prisoner was insane when he left Rome and came to Atlanta, and continued insane until he killed deceased, the fact that he drank liquor in the meantime can not render him liable, but he must be acquitted of murder.

Ninthly, Because the Court erred in charging the jury, that insanity produced proximately by drunkenness is no excuse for crime.

Tenthly, Because the Court erred in charging the jury, that insanity was an excuse, unless such insanity was produced by liquor.

Fifteenthly, Because the Court erred in submitting to the jury the question of drunkenness, as explanatory of his condition at the time of the homicide; and that the defendant could not protect himself from the responsibility of one crime, when committed during insanity produced by another crime voluntarily assumed. And

Sixteenthly, Because the charge of the Court, as a whole, and in each part, was error, in that it submitted to the jury questions not made by the issues and the facts, and did not submit to the jury the questions made by the issues and the facts.

Now, what is substantially the response of Judge Bull to all this? "I will not, gentlemen of the jury, confuse you or myself, by attempting to notice all these learned distinctions. The simple rule laid down by the law is, that if a man has capacity and reason sufficient to enable him to distinguish between right and wrong, as to the particular act in question: if he has knowledge and consciousness that the act he is doing is wrong, and will deserve punishment, he is, in the eye of the law, of sound mind and memory, and consequently, the subject of punishment. For the Code declares, that a person shall be considered of sound mind who is not an idiot, a lunatic, or affected by insanity; or who

hath arrived at the age of fourteen years, or before that age, *if such person knew the distinction between good and evil.*

"But, though it is the general rule, that insanity is an excuse, yet, there is an exception to this rule, and that is, when the crime is committed by a party in a fit of intoxication, though the party may be as effectually bereft of his reason by drunkenness as by insanity produced by any other cause. For drunkenness shall not be an excuse for any crime or misdemeanor, unless such drunkenness was occasioned by the fraud, artifice or contrivance of another. Nor does it make any difference, that a man by constitutional infirmity, or by accidental injury to the head or brain, is more liable to be maddened by liquor than another man. If he has legal memory and discretion when sober, and voluntarily deprives himself of reason, he is responsible for his acts in that condition. But if a man is insane when sober, the fact that he increased the insanity, by the superadded excitement of liquor, makes no difference. An insane person is irresponsible, whether drunk or sober."

I pause to remark, how fully does this concluding proposition meet the 8th ground of alleged error in the motion for a new trial, to wit: That if the jury believed that Choice was insane when he left Rome and came to Atlanta, and until he killed deceased, then, the fact that he drank liquor in the meantime can not render him liable, but he must be acquitted of murder. Certainly, responds the Judge; for an insane man is irresponsible, whether drunk or sober!

But to proceed with the charge—"These are the rules for determining the question of insanity, and the degree and nature of irresponsibilty to the law. The law presumes every man of sound mind till the contrary appears, and the burden of proof is on the defendant, that, at the time of the commission of the act, he was not of sound mind. And it ought to be made to appear to a reasonable certainty, to your reasonable satisfaction, that, at the time of the commission of the act, the party did not know the nature and quality of the act, or, if he did, did not know that the act was wrong; and it devolves upon you to decide whether the defendant has, by proof, rebutted this legal presumption of sanity. If, after mature deliberation, you are satisfied, beyond a doubt, that the prisoner is guilty, you will find so; if not, you will find him not guilty."

Would that I could transcribe this admirable charge entire. For, in our judgment, it submits to the jury, full and fairly, the law upon the *only* questions made by the issues and the facts in this case.

Whether any one is born with an irresistible desire to drink or whether such thirst may be the result of accidental injury done to the brain, is a theory not yet satisfactorily established. For myself, I capitally doubt whether it ever can be. And if it were, how far this crazy desire for liquor would excuse from crime, it is not for me to say. That this controlling thirst for liquor may be *acquired* by the force of habit, until it becomes a sort of second nature, in common language, I entertain no doubt. Whether even a long course of indulgence will produce a pathological or organic change in the brain, I venture no opinion. Upon this proposition, however, I plant myself immovably; and from it, nothing can dislodge me but an Act of the Legislature, namely: that neither moral nor legal responsibility can be avoided in this way. This is a new principle sought to be ingrafted upon criminal jurisprudence. It is neither more nor less than this, that a want of will and conscience to do right, will constitute an excuse for the commission of crime; and that, too, where this deficiency in will and conscience is the result of a long and persevering course of wrongdoing. If this doctrine be true—I speak it with all seriousness—the Devil is the most irresponsible being in the universe. For, from his inveterate hostility to the Author of all good, no other creature has less power than Satan to do right. The burglar and the pirate may indulge in robbing and murder, until it is as hard for an Ethiopian to change his skin, as for them to cease to do evil; but the inability of Satan to control his will, to do right, is far beyond theirs; and yet, our faith assures us that the fate of Satan is unalterably and eternally fixed in the prison-house of God's enemies. The fact is, responsibility depends upon the possession of will—not the power over it. Nor does the most desperate drunkard lose the power to control his will, but he loses the desire to control it. No matter how deep his degradation, the drunkard uses his will whenever he takes his cup. It is for the pleasure of the relief of the draught, that he takes it. His intellect, his appetite, and his will, all work rationally, if not wisely, in his guilty indulgence. And were you to exonerate the ine-

briate from responsibility, you would do violence both to his consciousness and to his conscience; for he not only feels the self-prompted use of every rational power involved in acountability, but he feels, also, precisely what this new philosophy denies—his solemn and actual wrongdoing, in the very act of indulgence. Converse seriously with the greatest drunkard this side of actual insanity—just compose him, so as to reach his clear, constant experience, and he will confess that he realizes the guilt, and therefore the responsibility of his conduct. A creature made responsible by God, never loses his responsibility, save by some sort of insanity. There have always existed amongst men a variety of cases, wherein the will of the transgressor is universally admitted to have little or no power to dictate a return to virtue. But mankind have never, in any age of the world, exonerated the party from responsibility, except where they were considered to have lost rectitude of intellect by direct mental alienation.

Mr. M. N. Bartlett testified, that prisoner, after one of his sprees, would swear that he would quit drinking. And he stated to Mr. Wilkes, that vicious associations would lead young men to drink; and he thought there was no security when a young man took to his cups. Here was both consciousness and conscience. He did not seek to shield himself from responsibility, because he had lost the power to control his will, any more than David did from the crime of "blood-guiltiness;" because, overpowered by his lust, he had caused the life of Uriah to be sacrificed, in order that he might possess himself of his beautiful wife.

On the trial of Kleim, before Judge Edmonds, of Spiritual Rapping notoriety, in 1845, we find the first clear legal recognition of this *moral* insanity doctrine—a doctrine which destroys all responsibility to human and Divine law; and one originating, as I verily believe, in an utter misconception of man's moral and physical nature; an offshoot from that Bohon Upas of *Humanism*, which has so pervaded and poisoned the Northern mind of this country, and which, I fear, will cause the glorious sun of our Union to sink soon in the sea of fratricidal blood!

And this is the doctrine which is intended to be covered by the term, *"or otherwise,"* twice repeated in the 6th ground of the motion for a new trial; and to which attention was directed by the words in parenthesis, in copying that ground.

Had the Court been requested, in writing, to give charges upon this doctrine favorable to the prisoner, he ought to have declined. For, in the judgment of this Court, no such principle has been recognized in crimnal law, whatever may be the opinion of medical writers and others upon the subject.

When Choice killed Webb, he was sober, or drunk, or insane. If he was sober, or the homicide was committed in a mere fit of drunkenness, which is no excuse for crime, in either of these events, the offence was confessedly murder. But his defence is, that he was insane. It, then, becomes important, to inquire, What was the degree of insanity under which he labored? For the law, acting upon the assumption, perhaps, that all men are more or less insane, and that it is a question of degree only, has established a standard or test by which Courts are to be governed in the trial of criminal cases.

Judge Bull charged the jury, that the rule was this: That "if a man has capacity and reason sufficient to enable him to distinguish right and wrong, as to the particular act in question: if he has knowledge and consciousness, that the act he is doing is wrong, and will deserve punishment, he is in the eye of the law, of sound mind and memory," and therefore criminally responsible for his acts.

Did he state the rule correctly? This must be decided by authority—to which, I must say, very little reference has been made in the argument—and not by the speculations of Ray and Winslow, Bucknill and Tuke, and other medical writers, however ingenious they may be.

And it is worthy of notice, that a less degree of capacity is required in crimnal cases than in civil contracts. It may be an anomaly, still, this difference was distinctly maintained in Bellingham's case, who was tried for the murder of the Hon. Spencer Perceval, in 1812, and was convicted by Lord Erskine, on the trial of Hadfield for shooting at the King in 1800. Indeed, the amount of capacity which would make one responsible for criminal conduct, would stop far short of binding him upon a civil contract.

Lord Hale, in his *Pleas of the Crown, p.* 30, says: "There is a partial insanity, and a total insanity. Some persons that have a competent reason, in respect to some subjects, are yet under a peculiar *dementia* in respect to some particular discourses, subjects or applications; or else it is partial in re-

spect to degrees; and this is the condition of every man, especially melancholy persons, who, for the most part, discover their defect in excessive fears and griefs, and yet, are not wholly destitute of the use of reason; and this partial insanity seems not to excuse them in committing any offence, for it's matter capital; for doubtless, most persons that are felons of themselves and others, are under a degree of partial insanity when they commit these offences. It is very difficult to define the invisible line that divides perfect and partial insanity; but it must rest upon circumstances, duly to be weighed and considered by the judge and jury, lest on the one side there be a kind of inhumanity towards the defects of human nature, or on the other, too great an indulgence given to great crimes. Such a person, as laboring under melancholy distempers, hath yet, ordinarily, as great understanding as, ordinarily, a child of fourteen years hath, is such a person as may be guilty of treason or felony."

Arnold was tried in 1728 (8 *Hargrave's State Trials*, 322), for shooting at Lord Onslow. In this case, Mr. Justice Tracy laid down the law to be, "that it is not any kind of frantic humor, or something unaccountable in a man's actions, that points him out to be such a madman, as is exempted from punishment: it must be a man that is totally deprived of his understanding and memory, and doth not know what he is doing, no more than an infant—than a brute or a wild beast."

The trial of Hadfield took place in the King's Bench, before Lord Kenyon, in 1800, and is fully reported in *27 Howell's State Trials*, 1281. Some of the grounds occupied by Lord Erskine, and in which the Court acquiesced, were, substantially:

That it is unnecessary that reason should be entirely subverted or driven from her seat, but that it is sufficient if distraction sits down upon it, along with her, holds her trembling hand upon it, and frightens her from her propriety;

That there is a difference between civil and criminal responsibility; that a man affected by insanity is responsible for his criminal acts, where he is not for his civil;

That a total deprivation of memory and understanding is not requisite to constitute insanity.

In Bellingham's case, to which I have already alluded, and which is reported in 1 *Collinson on Lunacy*, 650, tried in 1812, Lord Mansfield charged the jury, that "the single

question for them to determine was, whether, when he committed the offence charged upon him, he had sufficient understanding to distinguish good from evil, right from wrong; and that murder was a crime, not only against the law of God, but against the law of his country." The defendant was convicted and executed, notwithstanding he labored under many insane delusions, as the facts in the case show. He determined to assassinate the Premier, that he might thus secure an opportunity of bringing his imaginary grievances before the country, and obtaining a triumph over the attorney-general. And the test applied in this case, by Lord Mansfield, of the power of distinguishing right from wrong, has ever since been adopted as the only one, to mark the line between sanity and insanity, responsibilty and irresponsibility.

Mr. Justice LeBlanc reiterated the test prescribed by Lord Mansfield, in *King vs. Bowler.* (1 *Collinson on Lunacy,* 673.) Lord Lyndhurst did the same thing in the late case of the *King vs. Oxford.* (5 *Carrington and Payne,* 168.) And in the still more recent case of Green Smith (see statement of the case in *Taylor,* 513), occurring in 1837, Mr. Justice Parke told the jury, that, as regards the effect of insanity or responsibility for crime, "it is merely necessary that the party should have sufficient knowledge and reason to discrimnate between right and wrong."

With one other citation, I shall conclude this branch of the discussion.

In 1843, took place the trial of McNaughton, for killing Drummond, which excited through England a great degree of interest. Lord Chief Justice Tindal, in this case, instructed the jury, that, before convicting the prisoner, they must be satisfied that, when committing the criminal act, he had that competent use of his understanding, as that he was doing a wicked and wrong thing; that he was sensible it was a violation of the law of God and man.

This trial occasioned the submitting of certain questions, by the House of Lords, to fifteen judges (that being the number, instead of twelve, as formerly), with a view of eliciting their opinions in regard to criminal responsibility. Those questions and answers were designed to settle the law of England on this subject.

Question 1: What is the law respecting alleged crimes,

committed by persons afflicted with insane delusions, with respect to one or more particular subjects or persons; as, for instance, when, at the time of the commission of the alleged crime, the accused knew he was acting contrary to law, but did the act complained of with the view, and under the influence, of some insane delusion, of redressing or avenging some supposed grievance or injury, or of producing some supposed public benefit?

Answer: The opinion of the judges was, that, notwithstanding the party committed a wrong act, while laboring under the idea that he was redressing a supposed grievance or injury, or under the impression of obtaining some public or private benefit, *he was liable to punishment.*

Question 2: What are the proper questions to be submitted to the jury, when a person alleged to be affected with insane delusions, respecting one or more particular subjects or persons, is charged with the commission of a crime—murder, for example—and insanity is set up as a defence?

Answer: Before a plea of insanity should be allowed, *undoubted* evidence ought to be adduced, that the accused was of diseased mind, and that at the time he committed the act, he was not conscious of right and wrong. Every person was supposed to know what the law was, and therefore, nothing could justify a wrong act, except it was *clearly* proved, that the party did not know right from wrong.

Question 3: If a person under an insane delusion, as to existing facts, commits an offence, in consequence thereof, is he hereby excused?

Answer: If the delusion were only partial, the party accused was equally liable with a person of sane mind. If the accused killed another in self-defence, he would be entitled to an acquittal; *but if the crime were committed for any supposed injury, he would be liable to the punishment awarded by the laws to his crime.*

The charge of the Court, then, tested by a full review of the English cases, from Lord Hale to the present time, and with which all the best considered American cases agree, is fully sustained. And *Humanitarians* should deliberate maturely, before they lend their aid to break down a rule, which has received the sanction and approbation of the wise and the good for centuries. One other point, and we are done. Was the verdict of the jury contrary to the evidence?

9. Under the Act of 1853-'54, it is not only the privilege, but made the imperative duty of this Court, to express an opinion upon the testimony in this case, because several of the grounds in the motion for a new trial are, that the verdict was contrary to, and decidedly against the weight of the evidence. I have carefully examined the evidence again, and again, and speaking as it were from the jury-box, rather than the bench, I will state succinctly the conclusions at which I have arrived: The proof has utterly failed to establish that, apart from liquor, the accident of 1850 has inflicted any permanent injury upon the brain of the accused.

During the eight years which intervened between the accident of 1850, and the homicide, where was Wm. A. Choice, and what was his manner of life? He was no recluse, but, from his education, social position, and employments, he mingled much in society. He had been a clerk at Milledgeville; and Dr. Gordon, in his testimony, states as a reason why he noticed him while there, was, that he had often heard him spoken of as a man of a high order of talents, and that his prospects were bright for making a star comedian. Having heard such reports often, and also having seen his name favorably spoken of by the Press, he was induced to examine him critically. There were, perhaps, few men, of his age, more generally known.

Where are all his acquaintances—the cloud of witnesses that might have been brought forward to testify to his insanity? Not to distinct facts, these might have been forgotten—but who would state that they had known him for years, that they had repeatedly conversed with him, and heard others converse with him, that apart from the influence of liquor, and when entirely sober, they had noticed in these conversations, that he was incoherent and silly; that, when wholly free from the influence of stimulants, he was wild, irrational, and crazy. Some few, it is true, have spoken, but where are the five hundred who keep back?

On the contrary, you are met at every step in the evidence with such expressions as the following: "Think prisoner was drunk at the time of the difficulty in the barroom," "Has known Choice intimately for several years, and considers him a man of promise and talents, but subject to eccentricities—never seen him when he considered him insane—witness thinks him, when drinking, the most dangerous man

he ever saw." "Has never seen him, only when under the influence of liquor, insane." "Mr. Choice is a very violent man when drinking." "When prisoner threatened to kill witness was three or four years ago. He had been drinking at the time—when under the influence of liquor he is a very violent man."

The proof of insanity, apart from liquor, in this case, is too meagre to raise a reasonable doubt as to the capacity of the accused to commit crime. Who can not count from one to twenty men, within the circle of their acquaintance, who never suffered any injury upon the head, or elsewhere, and whose rationality, except when drinking, was never questioned, concerning whom more proof could be adduced to convict them of insanity, than the record in this case furnishes, to prove the insanity of Choice?

It may be, that, owing to the accident of 1850, the defendant was not only more easily affected by liquor, but, also, that he had less power to control his appetite for drink. Still this, if true, would not excuse him. A man may have partial or general insanity, and that, too, from blows upon the head, yet if he drink, and bring on temporary fits of drunkenness, and, while under the influence of spirits, takes life, he is responsible. "There are men," says Mr. Justice Story, "soldiers who have been severely wounded in the head especially, who well know that excess makes them mad; but if such persons wilfully deprive themselves of reason, they ought not to be excused for one crime, by the voluntary perpetration of another."—*United States vs. Drew.*　5 *Mason's U. S. Rep.* 28.

It is insisted, particularly, that the finding was against the medical testimony in this case; without repeating it, I would state, generally, that the strength of this evidence is greatly overstated in the argument, as the brief of it will show. As it respects this species of testimony generally, the doctrine is this: It is competent testimony; and where the experience, honesty and impartiality of the witnesses are undeniable, as in this case, the testimony is entitled to great weight, and consideration. Not that it is so authoritative, that the jury are bound to be governed by it—it is intended to aid and assist the jury in coming to correct conclusions in the case.

With something short of a hundred more opinions to write

out during the recess, to say nothing of numerous other pressing engagements, we have bestowed upon this case all the time and consideration at our command.   And what is the case?

Choice comes down from Rome to Atlanta.   He engages in a drunken debauch, as has been the habit and manner of his life.   Webb, the deceased, a constable, serves bail process upon him for ten dollars—Choice is greatly incensed, and such was the sense of injury which he felt, that he spoke complainingly of Webb's treatment to Branan, when he was brought up from Milledgeville the April afterwards.   Mr. Glenn, who happened to be present, interposed his kind offices, and agreeing to pay the debt, the parties separated, while Choice professed to acquiesce in the suggestion of Mr. Glenn, that the officer had done nothing more than his duty. It is clear, that he was still writhing under the indignity, as he felt it to be, that had been offered him.   He said to Thos. Gannon, "what do you suppose that damned bailiff done?   He arrested me for ten dollars, and would not take my word for the amount;" and after soliciting a knife, or a pistol, he said he would cut the bailiff's heart or Dr. Dowsing's—the creditor's—heart.   Rising next morning from the carouse of the overnight, he commenced drinking again, and coming up with Webb—who was walking between the Trout House and the Atlanta Hotel toward the depot—he fires a pistol at him twice, and thus takes his life.   The only thing said by deceased, was, "Don't shoot;" and the only words uttered by Choice, were, "Damned if I don't kill you anyhow."   When Webb staggered and fell, Choice started off, saying, "You will take that," or, "Damn you, take that."

In his interview with Mr. Wilkes, in the callaboose, Choice ascribed his situation to drink, which made him a fool and a madman; but made no allusion to any permanent injury to his brain in 1850.   Choice understood himself much better than the intelligent witnesses who testified, and this whole record demonstrates, to my mind, that he was right.

Unless his offence can be excused, or mitigated, by the plea and proof of drunkenness, the verdict of the jury was fully justified by the facts.   The prisoner has had a fair trial. The law, in the judgment of this Court, has been correctly administered, and when we have said this, our duty is discharged.

## JUDGMENT.

Whereupon, it is considered and adjudged by the Court, that the judgment of the Court below be affirmed.